**NCNB NATIONAL BANK OF NORTH CAROLINA, Appellee,**

v.

**Ralph L. TILLER; Julia K. Tiller; Ellen Tiller Bass; Julia Tiller Boyd; Emily Louise Kellahan; Dr. Wendell H. Tiller; Walter Armstrong Kennedy, III; Estate of Wendell H. Tiller (Deceased) by Ralph L. Tiller and Dr. Wendell H. Tiller, Co-Executors, Appellants.**

**WILLIAMSON BROTHERS FERTILIZER AND GRAIN, INC., Appellant,**

v.

**NCNB NATIONAL BANK OF NORTH CAROLINA, Appellee.**

**NCNB NATIONAL BANK OF NORTH CAROLINA, Appellee,**

v.

**Ralph L. TILLER; Julia K. Tiller; Ellen Tiller Bass; Julia Tiller Boyd; Emily Louise Kellahan; Dr. Wendell H. Tiller; Walter Armstrong Kennedy, III, Appellants.**

**Nos. 85–2295, 86–2512 and 85–2532.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 11, 1986.

Decided March 17, 1987.

Rehearing and Rehearing En Banc Denied May 20, 1987.

Larry E. Parrish (Parrish & Mulrooney, P.C., Memphis, Tenn., on brief), for appellants.

Daniel G. Clodfelter (Richard W. Evans, Moore, Van Allen, Allen & Thigpen, Charlotte, N.C., Finley B. Clarke, Clarke & Johnson, John T. Moore, Florence, S.C., Nelson, Mullins, Grier & Scarborough, Columbia, S.C., on brief), for appellee.

Before CHAPMAN and WILKINSON, Circuit Judges and BOYLE, United

States District Judge for the Eastern District of North Carolina, sitting by designation.

CHAPMAN, Circuit Judge:

This frivolous appeal arises from an action by NCNB National Bank of North Carolina (NCNB) to enforce a guaranty agreement given to it by appellants Ralph and Julia Tiller. Because the counterclaims made by the Tillers against NCNB were virtually identical to the issues which Williamson Brothers Fertilizer and Grain, Inc. (Williamson) raised in a suit against NCNB in the same court and coupled with the fact that both the Tillers and Williamson were represented by the same attorney, Larry E. Parrish of Memphis, Tennessee, the trial court consolidated the two cases. At trial NCNB prevailed upon every claim in each suit. Appellants Tiller and Williamson appealed. The issues raised herein are legion. They seem to be without number. They are also without merit. The multiplicity of exceptions taken spans the entire spectrum of potential judicial error. Appellants question the sufficiency of the evidence, various evidentiary rulings, statutory interpretations and the decision of the trial judge to dismiss a variety of their claims ranging from charges of usury and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) to common law contract actions.

The completely untenable positions of appellants are both contrary to established principles of law and without any substantial factual basis. We find it necessary, not only to impose sanctions pursuant to Fed.R.App.P. 38 upon appellants and their counsel, but also to remand this case to the district court so it may consider whether sanctions are appropriate under Fed.R.Civ.P. 11. Furthermore, pursuant to 4th Cir.R. 30, we find it necessary to impose sanctions upon attorney Parrish for unreasonably and vexatiously increasing the cost of this litigation by the inclusion of voluminous unnecessary materials in the appendix.

I.

Southern Agricultural Chemicals, Inc. (Southern) is a closely held corporation controlled by the Tiller family. In 1977, Southern received a line of credit from NCNB for 1.5 million dollars. Ralph Tiller, as president of Southern, signed the promissory note upon which interest was due from Southern at the rate of "one percent over the NCNB prime rate" for any money borrowed.

In July of 1981, NCNB's loan to Southern was refinanced. Three separate promissory notes were created. A portion of Southern's obligation to NCNB was payable with a fixed interest rate. The bulk of the debt, however, as well as a new nine hundred thousand dollar line of credit, was to be repaid at a variable interest rate which was tied to the "NCNB prime rate". As additional security, Ralph and Julia Tiller executed a personal guaranty making themselves responsible for the debts of Southern should Southern be unable to repay the loans. Also, in August 1982, after Southern had been in default on these notes for some time, Ralph Tiller and his father, Wendell H. Tiller, agreed to subordinate certain Southern notes, held by them, to the debt of Southern to NCNB.

In March 1983, Southern filed a Chapter 11 bankruptcy petition. In July 1983 this petition was involuntarily converted to a Chapter 7 liquidation. In September 1983, NCNB filed suit against Ralph and Julia Tiller seeking enforcement of the guaranty agreement. After a motion to dismiss was denied, the Tillers answered the complaint and, with Wendell H. Tiller as co-counterclaimant, filed a series of counterclaims against NCNB. The Tillers alleged that certain loan contracts, their guaranty and the subordination agreement were invalid, and that NCNB had violated various provisions of 18 U.S.C. § 1961 *et seq.* (RICO), and that NCNB had committed acts of common law fraud, fraudulent inducement, and usury and had violated the South Carolina Unfair Trade Practices Act.

Shortly after the NCNB action to enforce the guaranty was filed, a suit was brought against NCNB by Williamson, which also

had a loan agreement with NCNB. Williamson sued alleging indefiniteness of contract, violations of various RICO provisions as well as the South Carolina Unfair Trade Practices Act, breach of a confidential relationship, and usury. Based upon the similarity of the charges made by Williamson, and the representation of Williamson and the Tillers by the same attorney, the trial judge joined the Williamson suit with the Tiller action.

The cases were tried together to a jury. At the close of the evidence, the district judge directed a verdict in favor of NCNB on all the counterclaims and claims which had been asserted by the Tillers, and also on all the claims asserted by Williamson, except the fraud claims. The judge submitted the original claim by NCNB to collect on the Tiller guaranty and the fraud claims asserted by Williamson to the jury. The jury found for NCNB on all claims brought by Williamson and returned a verdict for NCNB against the Tillers for $1,268,032.60, the full amount sought under the guaranty. The jury also answered a special interrogatory concerning the determination of NCNB's prime rate of interest, finding that NCNB had correctly calculated and charged interest to its borrowers under the promissory notes that used the bank's prime rate of interest.

By consent of the parties, the district court, sitting without a jury, heard NCNB's action to set aside, as fraudulent, certain transfers of real property made by the Tillers to their daughters and transfers of stock and other intangibles to trustees for the benefit of the Tillers themselves. Finding these conveyances were fraudulent as a matter of law, the district court entered judgment for NCNB, setting aside the challenged conveyances. This appeal followed with all appellants being represented by attorney Parrish.

## II.

Appellants present thirteen arguments in an effort to demonstrate the presence of reversible error. Although each of these thirteen points is sorely lacking in persuasiveness, a synopsis of appellants' arguments, and this court's reasoning in rejecting them, is necessary to explain why the arguments lack merit and the appeals are frivolous.

## PRIME RATE

Although appellants' brief contains a plethora of alleged errors at trial, their primary contention is that the district court erred in dismissing the various causes of action based upon NCNB's use of the term "prime rate" in its business practice. Appellants argue that NCNB, through its use of the term "prime rate" in its loan agreements, has injured them in a manner which is compensable under RICO, the South Carolina Unfair Trade Practices Act, both North and South Carolina usury statutes, and under various common law fraud and contract theories.

The bulk of appellants' sixty page brief is an effort to convince this court of the merit of their contention that a cause of action exists based upon NCNB's actions which allegedly constitute "prime rate fraud". These efforts to frame the issue and place it before this court are unsuccessful.

The issues presented are unworthy of the vast amount of paperwork which they have prompted. Appellants attempt to persuade us that there exists sufficient evidence on the record to create a cause of action under RICO, under a variety of other state and federal statutes, and under the common law. Yet their offers of proof of violations consisted of a multiplicity of vague definitions of the "prime rate", and an "expert" who, while insisting that NCNB has violated the loan agreements through its calculations of its "prime rate", claimed the alleged violation had occurred through NCNB's failure to use *his* theoretical method of calculation of the prime rate. He admitted that *his* calculation is not used by any financial institution within the United States.

Perhaps the most distressing aspect of these arguments is that, despite the central theme of the brief being a claim that NCNB misrepresented how its "prime

rate" was calculated, not one of the thirteen issues presented on appeal address a legitimate question of law or fact.

## RICO

In their RICO claims, appellants first contend that NCNB violated 18 U.S.C. § 1962(b) (1984) by acquiring and maintaining control of both Southern and Williamson through either a pattern of racketeering activity or the collection of an unlawful debt. The district court dismissed this claim because neither appellant was able to present any evidence which showed that NCNB had control over the operations of either corporation. Appellants contend that NCNB's right to demand payments on the notes gave it the power to control both Southern and Williamson. This is ludicrous, but appellants then argue that to the extent that cash was inaccessible to Williamson or Southern, NCNB effectively kept both parties apprehensive about the possibility of foreclosure. Anyone in default on a note secured by a mortgage may be anxious or even apprehensive but such concern is not actionable and is a patently improper use of RICO. This with so much of what appellants have done is a transparent effort to use RICO to discourage legitimate efforts to collect a debt found by the jury to be valid and owing.

■ NCNB's only interest in either company was in its status as a secured lender. NCNB had the right to demand payment on its loans under certain circumstances and to collect on its collateral security. Although NCNB did require that the companies maintain consistent and understandable records of their sales and accounts receivable, there is no evidence suggestive of control. NCNB did provide assistance to Williamson in obtaining financing from the Small Business Administration, but there is no evidence in the record that NCNB forced Williamson to obtain this credit or that the financing obtained was not in the best interest of Williamson.

■ The normal incidents of a borrower-lender relationship, including monitoring, protection and disposition of collateral, do not amount to control. Actual day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions is required for the purposes of showing that a lending institution had control over a borrower. *See, e.g., Cossoff v. Rodman,* 699 F.2d 599, 610–11 (2nd Cir. 1983) (creditor's monitoring of operations and proffering management advice, without more, does not constitute control); *Cooper v. Union Bank,* 527 F.2d 762, 765 (9th Cir.1975) (provisions in loan agreement giving bank right to accelerate indebtedness if debtor fails to remit monthly activity reports or if debtor changes management do not constitute control); *Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.,* 483 F.2d 1098, 1104 (5th Cir.1973).

■ The district court also dismissed two other claims which the appellants brought under 18 U.S.C. § 1962(a) and (c) (1984). Each of these subsections prohibit various types of interaction between "persons" and "enterprises" when racketeering activities are involved. Appellants contend that NCNB is the "person" under the applicable subsections and that NCNB Corporation, a bank holding company which is the sole shareholder of NCNB, is the affected "enterprise" thus meeting the relational requirements of 18 U.S.C. § 1962(a) and (c). As appellants concede, this court has previously held that a "person" is not distinct from an "enterprise" when a corporation and its wholly owned subsidiary are involved. *United States v. Computer Sciences Corporation,* 689 F.2d 1181, 1190–1191 (4th Cir.1982). Appellant, without any explanation or reasoning, has simply cited several cases which differ with this court's holding in *Computer Sciences.* The record contains no evidence regarding NCNB's relationship with the NCNB Corporation other than the fact that NCNB Corporation received a substantial portion of its revenue as dividends from NCNB. Thus even were this court not bound by *Computer Sciences,* there is no evidence in the record to support a claim of a relationship between NCNB and NCNB Corporation in violation of either 18 U.S.C.

§ 1962(a) or (c). The trial judge's dismissal of these claims at the end of the trial was not error.

## USURY

■ Appellants also argue that the district court erred in dismissing their usury claims against NCNB. They contend that the rate of interest charged by NCNB was usurious and violated 12 U.S.C. § 85 (Supp. 1986) and 12 U.S.C. § 86 (1945). Similarly, appellants allege that the promissory notes and the interest NCNB charged were usurious under whichever law applied, South Carolina or North Carolina. Appellants made no effort to inform the court as to which law should apply. Under federal law, a bank's interest rate is usurious only if it is usurious in the state in which the bank is located. 12 U.S.C. § 85.

■ In North Carolina, any foreign or domestic corporation substantially engaged in business for profit may pay, and any lender may charge and collect, interest at any rate to which the parties agree in writing. N.C.Gen.Stat. § 24-9 (1986). Based upon these statutes, appellants' arguments regarding usury must fail. Williamson is a corporation which was engaged in business for pecuniary gain. It entered into a written agreement with NCNB. The same result would obtain for Southern were the Tillers entitled to enforce Southern's rights.[1]

## UNFAIR TRADE PRACTICES

Appellants also take exception to the dismissal of their claim that NCNB violated the South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-10 (1976) *et seq.* However, the Unfair Trade Practices Act does not apply to actions permitted under law or administered by any regulatory body or officer acting under the statutory authority of the United States of America. S.C. Code § 39-5-40(a) (1976).

■ Congress has given the Board of Governors of the Federal Reserve System authority to promulgate and enforce regulations to define and prevent unfair or deceptive acts or practices by banks. 15 U.S.C. § 57a(f) (Supp.1986). Pursuant to this statute, the Comptroller of the Currency has established a formal complaint and investigation procedure to deal with alleged unfair or deceptive acts or practices by national banks. This regulation of the banking industry by Congress is sufficient to come within the exception to the Unfair Trade Practices Act established by S.C. Code § 39-5-40(a). *See, McCleod v. Rhoades,* 275 S.C. 104, 267 S.E.2d 539 (1980) (transactions in question are regulated by the Securities Exchange Commission and the South Carolina Uniform Securities Act, and are therefore exempt from the coverage of the Unfair Trade Practices Act.)

## DERIVATIVE CLAIMS

■ Appellants Tiller also argue that the district court wrongly denied them standing to assert causes of action for injuries suffered by them, as stockholders, because of injury to Southern caused by NCNB. The Tillers contend that they subordinated Southern's liability to them which may have had priority over NCNB's notes, therefore, they claim standing to assert Southern's claims against NCNB. We reject this position. Although the stockholders of a corporation suffer when the corporation incurs a loss, only the corporation may vindicate its rights. An indirectly injured party should look to the recovery of the directly injured party, not the wrongdoer for relief. This principle applies to RICO cases. *Carter v. Berger,* 777 F.2d 1173, 1175-76 (7th Cir.1985). In order to recover for an injury, a claimant must

---

1. Since at the time of the transactions, NCNB could not legally operate banking offices in South Carolina, it follows that North Carolina law must govern this portion of the transaction. While it seems clear to this court that South Carolina law does not apply, it is interesting to note that the law as it existed in South Carolina before the repeal of all usury statutes would have allowed NCNB and either Southern or Williamson to contract regarding loans at any interest rates they desired. S.C. Code § 34-31-80 (1976), repealed by 1982 Act No. 385 § 57(1) (Supp.1986).

prove wrongdoing, causation in fact, and the existence of damages. The appellants in this case have proven nothing.

## FRAUDULENT TRANSFERS

 Finally, appellants most transparent efforts at legal legerdemain are presented in their arguments regarding the district court's ruling to set aside certain fraudulent transfers by the Tillers. First, the Tillers argue that NCNB waived the protection of S.C. Code § 27–23–10 (1976), which prohibits fraudulent conveyances to avoid debt, by placing in the guaranty agreement a prohibition against the transfer of stock in Southern by the Tillers. The Tillers contend that since the guaranty only prohibits the transfer of stock, it necessarily allowed them to transfer any other property which they own without concern for their obligations to NCNB. A waiver is an intentional abandonment of a known right, not a mere trick to catch one napping. *McKee v. McGhee*, 114 S.C. 183, 103 S.E. 508 (1920). There is no evidence in the record to imply that NCNB waived its rights to prohibit the Tillers from giving away all their tangible assets so as to be unable to satisfy their obligation under the guaranty after Southern went bankrupt.

 Under South Carolina law, every conveyance of land, goods or chattels made with the intent or purpose to delay, hinder or defraud creditors shall be deemed to be void. S.C. Code § 27–23–10 (1976). Under this statute, conveyances may be set aside in two situations. First, even though a conveyance is made for valuable consideration, it will be set aside if it is made by the grantor with actual intent to defraud and that intent is imputable to the grantee. *Jeffords v. Berry*, 247 S.C. 347, 351, 147 S.E.2d 415, 418 (1966). Second, where the transfer is made without consideration and the transferor retains insufficient property to meet his debts, the transfer will be set aside regardless of the intent of the debtor or the transferee. *Gardner v. Kirven*, 184 S.C. 37, 42–43, 191 S.E. 814, 816 (1937). The Tillers argue that there is no proof that after the transfers they had not reserved a sufficient amount of property

with which to pay any debt owing to NCNB. The record, however, clearly shows that Ralph Tiller admitted that he transferred substantially everything of value that he owned without receiving any kind of consideration. More persuasive proof of a fraudulent transfer would be difficult to imagine. Once again the arguments raised by appellants are without merit.

The court has considered the other issues raised by the appellants and finds them to be equally without merit.

### III.

Appellants and appellants' counsel have been creating consternation within this court since the inception of this appeal. On the date of the original deadline established in this court's briefing order, appellants submitted a "draft" brief of 191 pages and filed a motion for leave to file separate briefs or, in the alternative, for leave to file a joint brief in excess of 50 pages. Despite this highly irregular action, appellants were granted leave to file a brief of 60 pages and a reply brief of 30 pages and they were granted an extension of time for the filing of said briefs. Appellants subsequently filed a joint brief which was technically within the 60 page limit but which frequently referred to the 191 page "draft" brief which was attached to the joint brief (as Exhibit A). This new brief also contained repeated references to the many briefs and memoranda used in the district court. By order of July 14, 1986, appellants were advised that neither the 191 page "draft" brief nor the several district court legal briefs and memoranda were part of the record on appeal and that we would disregard both the references and the materials. Appellants subsequently filed a substituted joint brief which made no reference to this superfluous material.

Even as the problem regarding the briefs was being resolved, another controversy began to brew. Appellants first requested an interpretation from the clerk's office as to appropriate matter to be submitted as an appendix. The clerk correctly informed appellant that all material in the appendix

must be in the record on appeal as designated by the clerk of the district court. *See,* Fed.R.App.P. 10 and 30. This did not satisfy appellants, and soon a flurry of letters passed between appellants' counsel and the clerk's office. Appellants' counsel argued that the contents of the appendix need not be taken from the record of the case as sent up by the district court. The clerk's office repeatedly advised appellants' counsel that any documents, which were not part of the record, could be included in the appendix, if counsel satisfied the district court clerk's rules for designation of materials as part of the record. Appellants' counsel made no effort to approach the district clerk but submitted to this court a 3,106 page appendix.

Appellees subsequently filed a motion to strike non-record materials from the appendix. Appellees pointed specifically to eight items which were not included in the record on appeal, but which appellants insisted upon including in the appendix. These items include a variety of memoranda by both appellants and appellees supporting and opposing various motions filed in the trial court. Under Fed.R.App.P. 30(a), memoranda of law in the district court should not be included in the appendix except where they have independent relevance, and these additions did not qualify under the rule.[2]

While this court granted appellees' motion to strike approximately 184 pages of the appendix, we took no action upon the claim of appellee for attorney's fees incurred in bringing the motion to strike and we held this claim in abeyance until after the appeal.

■ Our review of the appendix shows it to be replete with documents bearing no relation to this appeal. In addition to the aforementioned memoranda of law, virtually every motion and answer submitted by the parties, as well as a multiplicity of discovery documents, are included in the appendix. Similarly, entire volumes of the appendix consist of excerpts of the transcript of the trial which are irrelevant to

this appeal. These excerpts are rarely cited by appellants in their brief and when they are cited, rather than providing the court with the appendix page in question, appellants cite to the page and volume in the record itself. This is an extremely disagreeable practice which led to a great deal of frustration in attempting to extract the relevant portions of the appendix from the massive amounts of irrelevant material.

Appellants also chose to include approximately four hundred pages of loan profile questionnaires which had been submitted by NCNB as evidence during the trial. Similarly, appellants included what appears to be the bulk of correspondence between NCNB and Southern Agricultural Chemical as well as copies of the statements of account which Southern received during several of the years in question. Approximately 100 pages of photocopies of Southern's cancelled checks were included for no apparent reason. Clearly, the relevant portions of this appendix were made extremely difficult to locate and analyze due to the vast amount of surplusage which appellants chose to include, and appellants' unwillingness to cite to their own pagination of the appendix magnified the problem.

As has been outlined previously, this entire appeal is meritless and frivolous. If there were any valid points of law or fact, they were well disguised or lost in the excess verbiage of the brief and the appendix. Although it is conceivable that appellants presented this court with a good faith argument that the *Computer Sciences* decision should be overturned, appellants' argument consisted only of citations to cases contrary to the precedent which this court is bound to follow. The appeal on this point, moreover, contains absolutely no reasoning. Appellants simply urged the court to look at the other cases and change its mind.

The RICO claims of appellant as well as their claims under the South Carolina Unfair Trade Practices Act are supported by no factual basis whatsoever. Appellants have been content simply to throw a mas-

---

**2.** 4th Cir. I.O.P.–30.1 provides in part "the appendix should contain only those parts of the record vital to the understanding of the basic issues on appeal."

sive number of words at the court in the hope that we would divine a cause of action. These claims are particularly unpersuasive in light of the jury's answer to the district court's interrogatory, that NCNB had properly used its prime rate in dealing with appellants. The jury also found that NCNB had properly calculated the interest owed by appellants' upon the promissory notes. Appellants audacious attempt to charge NCNB with violations of state usury statutes in the face of a specific North Carolina statute which allows lending institutions to charge corporate borrowers whatever interest rate they agree upon in writing is an abuse of pleading and frivolous.

Finally, and perhaps most frivolous, is the Tiller's contention that the trial judge erred in setting aside the fraudulent conveyances made to their relatives, because they were based upon insufficient evidence. In light of the admission by Mr. Tiller that he conveyed the land to his relatives for no consideration and thereby completely depleted his tangible personal assets, the appeal on this finding was a waste of this court's time. These admissions alone provide sufficient evidence to set aside the challenged conveyances under *Gardner v. Kirven.*

At oral argument attorney Parrish was advised by the presiding judge that the panel was concerned that this was a frivolous appeal and subject to sanctions under Fed.R.App.P. 38. The panel solicited reasons from the attorney as to why sanctions should not be applied. In his reply argument he addressed this point. Three weeks after argument the attorney submitted a 20 page motion and supporting memorandum entitled "written rebuttal argument" and later submitted a "supplemental written rebuttal" of 18 pages. In December he filed a lengthy motion to recuse the panel and shortly thereafter filed a supplement to the memorandum in support of the motion of recusal. The grounds for recusal were totally lacking in merit.

■ Having concluded that this appeal is frivolous, pursuant to Fed.R.App.P. 38, we impose upon appellants, Williamson

Brothers Fertilizer and Grain, Inc., Ralph L. Tiller, Julia K. Tiller and the Estate of Wendell H. Tiller, deceased, double legal costs of appellee in this appeal. Similarly, we also find that the unnecessary inclusion of materials in the appendix has unreasonably and vexatiously increased the cost of this litigation. Based upon our previous order to strike materials in which we held the issue of sanctions under advisement, we order appellants' counsel, Larry E. Parrish to pay to appellee's counsel 750.00 dollars pursuant to 4th Cir.R. 30.

Finally, this court was singularly impressed with the lack of either factual evidence or legal authority with which attorney Parrish supported appellants' claims. The claims under the South Carolina Unfair Trade Practices Act were completely without merit. Similarly, the Tillers' counterclaim and Williamson's complaint included RICO charges based upon nothing more than the musings of their attorney. Appellants alleged "control" by NCNB, yet they provided no evidence at trial to imply that NCNB did anything more than monitor the business affairs of a debtor. Appellants sought to find a "conspiracy" under RICO without evidence that there even existed sufficient conspiratory parties and with the foreknowledge of our opinion in *U.S. v. Computer Sciences Corporation.* Even as examples of meritless claims, appellants' further claims need not be reiterated.

■ When an attorney signs an answer and counterclaim he should know that even allegations of RICO violations may not be made with impunity, if they are totally lacking of factual support. For these reasons, we feel that the district court should evaluate appellants' complaint, answer and counterclaims under Fed.R.Civ.P. 11, which, in pertinent part, provides:

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law,

and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

It is clear from the language of Rule 11 that an attorney has a duty to conduct a pre-filing examination of both the facts and law before instituting legal process. While, as the Advisory Committee noted, the Rule was not intended to "chill an attorney's creativity," it was unquestionably expected to "streamline the litigation process by lessening (sic) frivolous claims or defenses". Fed.R.Civ.P. 11 advisory committee note.

 If an attorney's conduct appears to fall within the scope of Rule 11, the court must first examine the actions at issue according to a standard of objective reasonableness. At this stage, the inquiry focuses only on whether a reasonable attorney in like circumstances would believe his actions to be factually and legally justified. If the standard of objective reasonableness is not met, sanctions are mandatory. *Cabell v. Petty*, 810 F.2d 463 (4th Cir.1986).

Based upon the appeal and the record before us, it seems that appellants and their counsel have engaged in a speculative effort to avoid their obligations and perhaps to gain for themselves some unwarranted benefit at NCNB's expense. Given the clear absence of a legal or factual basis for this appeal, we are left with the opinion that appellants' counsel may have violated Fed.R.Civ.P. 11 by filing the claims below. The district court, having conducted the trial, is in a much better position to evaluate the actions of appellants' counsel. Although some sanction is required when an infraction occurs, the determination of what is appropriate is still a matter left to the sound discretion of the district court. *Cabell*. For this reason we remand this case to the district court for a determination of whether Fed.R.Civ.P. 11 was violated and, if so, what sanctions should be imposed upon appellants and appellants' counsel.

The decision of the district court is hereby affirmed and the case is remanded for further action in accordance with this opinion.

REMANDED.