CITY OF MILWAUKEE, Community Housing Preservation Corporation, and Neighborhood Improvement Development Corporation, Plaintiffs,

v.

UNIVERSAL MORTGAGE CORPORATION, a Wisconsin corporation; Grootemaat Corporation, a Wisconsin corporation; Marshall & Ilsley Corporation, a Wisconsin corporation; M & I Grootemaat Mortgage Corporation, a Wisconsin corporation; Fleet Mortgage Corporation, a Wisconsin corporation; James Lunz, individually and d/b/a Robert J. Lunz Company; Martin–Foster, Incorporated; Robert W. Hoag; Robert W. Hoag Company, Incorporated, a Wisconsin corporation; Robert A. Hoag; Gary Zirzow; Terry Gustafson; Les Simon; Preferred Real Estate Investment of Milwaukee, a Wisconsin corporation; Laurence Granof; Tom Frenkel; Mighty Company, Incorporated, a Wisconsin corporation; Randall Stein; Larry F. Buzzell; Richard E. Van Meter; and American Heritage Investments, Incorporated, a Wisconsin corporation, Defendants.

No. 88–C–0075.

United States District Court, E.D. Wisconsin.

Aug. 19, 1988.

Thomas J. Erickson, Milwaukee, Wis., for defendants Gary Zirzow & Terry Gustafson.

Thomas R. Schrimpg, Kluwin, Dunphy, Hinshaw & Culbertson, Milwaukee, Wis., for defendant Robert A. Hoag.

Grant Langley, Rudolph Conrad, Scott Thomas, Office of The City Atty., Robert H. Friebert, David P. Lowe, Friebert, Finerty & St. John, Milwaukee, Wis., for plaintiffs.

William R. Wherry, William J. Mulligan, William Sosnay, Mulcahy & Wherry, Milwaukee, Wis., for defendant Universal Mortg. Corp.

William R. Steinmetz, Allen N. Rieselbach, Steven P. Bogart, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Wis., for defendant Grootemaat Corp.

William H. Levit, Jr., Michael Ash, Michael B. Apfeld, Godfrey & Kahn, Milwaukee, Wis., for defendants Marshall & Ilsley Corp., & M & I Grootemaat Mortg. Corp.

Thomas L. Shriner, Jr., Richard M. Esenberg, Michael G. McCarty, Foley & Lardner, Milwaukee, Wis., for defendant Fleet Mortg. Corp.

## DECISION AND ORDER

WARREN, Chief Judge.

■ The racketeering laws (RICO) of both the United States and the State of Wisconsin provide that "any person" injured by violations of RICO laws may sue and recover either triple (U.S.) or double (Wisconsin) damages. This broad language, however, has been tempered by the judicial belief that, in a philosophical sense, the consequences of an act go forward like ripples in a pond and extending liability for RICO violations to all ends of the pond would fill the courts with endless litigation. To that end, the courts have held RICO claims to certain causation requirements. For example, a party may recover for direct but not indirect injuries resulting from a RICO violation. In the same vein, the injuries incurred by a plaintiff must have been proximately caused by the RICO violation. Thus, even though the statutes say "any person" may recover multiple damages for injuries suffered, the injuries may not be so removed from the RICO violation that recovery would offend traditional principles of justice.

In the case at hand, defendants are accused of a RICO scheme to defraud the United States Department of Housing and Urban Development into approving home mortgage insurance on loans for the purchase of dilapidated houses in Milwaukee. Plaintiffs, the City of Milwaukee and two non-profit neighborhood organizations, claim that as a result of defendants' RICO scheme, the City's policy of neighborhood preservation has been damaged, real estate and loan investment values have been lowered, criminal activity has developed, and funds from other city projects have had to be diverted in order to repair the destruction left by the scheme.

Based on the decision below, which includes reliance on interpretations of the RICO provisions that this Court is obligated to follow, the Court finds that as a matter of law, the injuries alleged by plaintiffs are too indirect and remote from the alleged scheme to permit recovery.

### I.

Plaintiffs City of Milwaukee, Community Housing Preservation Corporation, and Neighborhood Improvement Development Corporation brought suit on January 6, 1988, in Milwaukee County Circuit Court, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (federal RICO), 18 U.S.C. §§ 1961–68, and the Wisconsin Organized Crime Control Act (state RICO), Wis.Stats. §§ 946.80–87. Named as defendants were 11 corporations or businesses and 11 individuals. The defendants were characterized as either "mortgage lenders" or "sellers/brokers."

On January 22, 1988, the case was removed to the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. §§ 1441–1446. The case eventually was assigned to this Court. By that time various motions had been filed by the defendants. The motions included: (1) a combined motion by five mortgage lenders—Universal Mortgage Corporation, Grootemaat Corporation, M & I Corporation, M & I Grootemaat Corporation, and Fleet Mortgage Corporation—to ·dismiss the case under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted; (2) a motion by defendants Robert A. Hoag, James Lunz, and Martin Foster, Inc., to dismiss the case on the basis of the reasons put forth by the five mortgage lenders; (3) a motion by defendants M & I Corporation and Grootemaat Corporation to dismiss on grounds other than those put forth in their previous motion to dismiss; (4) a motion by defendants Terry Gustafson and Gary Zirzow to dismiss the case for failure to state a claim upon which relief can be granted; (5) one-paragraph, *pro se* motions to dismiss by defendants Larry Buzzell, Les Simon, Richard E. Van Meter, American Heritage Investment, and Laurence Granof; and (6) various discovery-related motions.

At a status conference held July 19, 1988, plaintiffs informed the Court that they had not served defendants Tom Frenkel, Randall Stein and Mighty Co., Inc. Also at the status conference, the Court signed a protective order, which resolved the pending discovery disputes.

The Court now turns to the motions to dismiss. Since the Court resolves the case on the basis of the issues of the directness and causation of the injuries, the Court makes no ruling on any alternative grounds for dismissing the complaint.

### II.

For the purpose of evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted, the Court must accept as true all of the allegations of a well-pleaded complaint. *First Interstate Bank of Nevada v. Chapman & Cutler*, 837 F.2d 775, 776 (7th Cir.1988). The complaint will be dismissed on that basis only if the plaintiffs can prove no set of facts upon which relief may be granted. *Id.* The 52–page complaint at issue is certainly well-pleaded. The following RICO violation is alleged.

The National Housing Act of 1934, as amended, 12 U.S.C.A. § 1707, et seq., allows the United States Department of Housing and Urban Development ("HUD") to insure mortgage loans by private lending institutions on single-family homes for low and moderate income families. Responsibility for the processing of borrower applications for HUD-insured mortgages and determination of credit rests with the private lending institutions that participate in the program. On each application for HUD mortgage insurance, the mortgage lender makes certain certifications to HUD on the financial status of the borrower. These certifications serve to induce HUD to issue a firm commitment for mortgage insurance.

When a homeowner obligated on a HUD-insured mortgage defaults under the mortgage loan agreement by failing to make

monthly mortgage payments, the mortgage lender makes an insurance claim and HUD pays off the balance of the mortgage loan to the mortgage lender. HUD then succeeds to the mortgagee interest and obtains legal title to the property through foreclosure actions or through the homeowner's conveyance of a deed in lieu of foreclosure. HUD's ability to pay mortgage insurance claims is insured by the United States. HUD's insurance payments are made from a pool of federal funds composed of insurance premiums paid by mortgagors nationwide.

During the period from 1982 through 1985, the defendants engaged in a scheme to defraud HUD. The seller/brokers purchased properties at distress-value prices, performed little or no repairs or improvement, and then sold the properties at prices above the fair market value to buyers who could not afford them. The seller/brokers effected the sales by arranging with the mortgage lenders to make mortgage loans to the buyers even though the buyers were poor credit risks. The seller/brokers arranged the financing for the buyers by preparing loan applications and submitting them to the mortgage lenders, who had been authorized by HUD to approve loans for HUD mortgage insurance. The applications contained false statements about the financial status of the buyer so that the buyer would qualify for the HUD insurance. The seller/brokers and mortgage lenders knew this information was false. The seller/brokers also procured real estate appraisals that contained inflated values for the properties.

As part of the scheme, the mortgage lenders intentionally failed to follow accepted practices of prudent lending institutions in appraisal, approval, and closing of the HUD-insured loans. The mortgage lenders believed there was no risk to them in approving the loans. Moreover, whether the purchaser defaulted or not, the mortgage lenders still earned considerable immediate income in each transaction in the form of prepaid interest and closing costs paid either by the purchaser or by others on behalf of the purchasers. The seller/brokers

would realize huge profits on the sales prices.

The scheme involved the use of the United States mails and interstate telephone lines, in violation of 18 U.S.C. §§ 1341 and 1343, and the use of forged or fraudulent writings in violation of §§ 943.38 and 943.-39, Wis.Stats.

Plaintiffs' complaint alleged the following damages:

32. As a direct result of the defendants' scheme to defraud HUD, plaintiffs have suffered damages in the following respects:

(a) In 1978, the City of Milwaukee formally adopted a city policy statement based on a policy of neighborhood preservation rather than demolition and urban renewal. This preservation policy was implemented by the creation of programs administered by plaintiffs NIDC [Neighborhood Improvement Development Corporation] and City of Milwaukee that provide loans, direct services, and investments to maintain and rebuild existing housing stock, maintenance of city-owned vacant land, and bonding for mortgage funds to assist others to purchase central City properties. This preservation strategy was designed to work in conjunction with a HUD insured mortgage program operated in accordance with the law. Since 1978 the City has received $189 million in Community Development Block Grants from the federal government and a blend of $21 million in federal, state and local funds, the substantial majority of which was targeted and spent in the central city in furtherance of the preservation strategy.

(b) The properties that were purchased and resold as part of the defendants' scheme to defraud are located in the City of Milwaukee within the area to which plaintiffs targeted their preservation program.

(c) Many of the home mortgage loans originated pursuant to defendants' scheme have gone into default and the properties have been acquired by HUD. These houses remain vacant for extended periods of time, they have boarded-up

windows and unkept yards, and they have become dangerous nuisances, targets of arson, vandalism and other criminal activity, all of which causes blight and dangerous living conditions in the neighborhoods in question, lowering the real estate values of all the houses in the neighborhood, including those for which plaintiffs have extended home improvement loans, resulting in an impairment of the plaintiffs' collateral in those instances.

(d) As a result of defendants' scheme, the plaintiffs have been deprived of the benefits of their preservation program and have lost the value of a substantial part of their investment in the central city.

(e) Each time a HUD-insured property goes into default due to defendants' scheme, property values in these neighborhoods are lowered and will result in a lower city tax base when these properties are reassessed.

(f) Plaintiffs have been required to divert funds that would have been used for other municipal purposes to repair the destruction caused by defendants' scheme. The plaintiff City of Milwaukee expends funds to acquire, rehabilitate and resell those properties that have been acquired by HUD through foreclosure proceedings or deeds in lieu of foreclosure. This program has been named the Homefront Foreclosure Project and is operated by the plaintiff Community Housing Preservation Corporation ("CHPC"), a not-for-profit Wisconsin Corporation organized by the City of Milwaukee for this purpose. The estimated CHPC cost for acquisition and rehabilitation of each HUD-foreclosed property is $40,000. CHPC has already acquired 104 properties for rehabilitation in an effort to begin reversing the cycle of disinvestment in the city neighborhoods caused by the defendants' conduct.

### III.

Title 18, United States Codes, § 1964(c), establishes the private cause of action for federal RICO violations. *Haroco, Inc. v. American National Bank & Trust Co. of Chicago,* 747 F.2d. 384, 386 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed. 2d 437 (1985) (per curiam). That section provides:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate district court and shall recover threefold damages he sustains and the cost of the suit, including a reasonable attorney's fees.

In order to state a claim upon which relief may be granted under § 1962(c), a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima v. Imrex,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Id.* A defendant is not liable for treble damages to everyone he might have injured by other conduct. *Id.*

Exactly what the link must be between the conduct of the RICO violation and the harm alleged by the victim has been viewed by courts from two related and often combined perspectives: one dealing with whether the injured party is the real party in interest under Rule 17(a), Fed.R.Civ.P.,[1] and the other dealing with whether the RICO violation was the proximate cause of the injury. In *Carter v. Berger,* 777 F.2d 1173 (7th Cir.1985), the United States Court of Appeals for the Seventh Circuit affirmed the dismissal of a RICO claim brought by taxpayers against defendants who had bribed a county board to receive lower tax assessments. The appellate court agreed with the district court that under Rule 17(a), the real party in interest was the county, even though the lower assessments had caused the plaintiffs to pay higher

---

**1.** Rule 17, Fed.R.Civ.P., provides, in part, that every action shall be prosecuted in the name of the real party in interest. The rule also provides that the Court shall not dismiss a case on the basis of the rule without allowing a reasonable time for joinder or substitution of the real party in interest.

taxes. The claims of individual taxpayers were dismissed for lack of standing. Judge Easterbrook, writing for a unanimous panel, relied on a proposition of Justice Holmes in *Southern Pacific Co. v. Darnell–Taenzer Co.*, 245 U.S. 531, 533, 38 S.Ct. 186, 186, 62 L.Ed. 451 (1918), that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." 777 F.2d at 1175. Judge Easterbrook concluded that, in the RICO case at hand, an indirectly injured party may not sue. *Id.* Other courts also have held that only direct injuries arising from the RICO violation—more specifically, the "predicate acts" of the RICO violation—fulfill the requirements of standing. *See National Enterprises v. Mellon Financial Services*, 847 F.2d 251 (5th Cir. 1988) (supplier of construction company that later filed for bankruptcy lacked standing to bring RICO suit against lender and loan officer whose kickback scheme allegedly prevented construction company from paying creditors); *Bass v. Campagnone*, 838 F.2d 10, 11–13 (1st Cir.1988) (rejecting direct-indirect distinction, but denying standing to individual union members in RICO claim against union officials on basis that union was real party in interest); *NCNB National Bank of North Carolina v. Tiller*, 814 F.2d 931, 937 (4th Cir.1987) (adopting principle of *Carter v. Berger* in dismissing derivative RICO claim of company stockholder); *Rand v. Anaconda–Ericsson, Inc.* 794 F.2d. 843, 849 (2nd Cir.1986) (shareholders lacked standing to maintain RICO action for injuries incurred by corporation); and *Warren v. Manufacturers National Bank of Detroit*, 759 F.2d 542, 544 (6th Cir.1985) (shareholder and creditor of corporation had no standing to bring RICO action for corporate injuries); *but see Terre Du Lac Association, Inc. v. Terre Du Lac., Inc.*, 772 F.2d 467, 472–73 (8th Cir.1985) (standing to a RICO action exists even though plaintiff only alleges indirect injury).

■ The second type of examination of the link between the RICO violation and a plaintiff's alleged injuries looks to the causation between the two. Recovery under RICO is limited to those injuries that are caused by the predicate acts. *Sedima v. Imrex*, 473 U.S. at 497, 105 S.Ct. at 3285; *see also Haroco v. American National Bank & Trust Company of Chicago*, 747 F.2d at 398 ("by reason of" language of RICO imposes a proximate cause requirement on plaintiff). Not only "caused," but, because of the nature of causation, "proximately caused." The Second Circuit decision in *Sperber v. Boesky*, 849 F.2d 60 (1988), is one of the most illustrative on this point, as well as one of the most recent.

In interpreting the RICO causation requirement (as with any issue of statutory interpretation) we start with the statutory language and the legislative history. In this case, the language is general and there is little legislative history. However, the Supreme Court has set out "general principles surrounding this statute," one of which is that "RICO is to be read broadly," not only because of Congress' "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 [105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346] (1985) (quoting P.L. 91–452, section 904(a), 84 Stat. 947). *See generally* Lynch, RICO: The Crime of Being a Criminal, 87 Colum.L.Rev. 661, 666–713, 938–945 (1987) (RICO recognizes new harms and creates new wrongs). Balanced against this is the principle—also recognized by *Sedima* and *Haroco, Inc. v. American National Bank and Trust Co.*, 747 F.2d 384 (7th Cir.1984), *aff'd*, 473 U.S. 606 [105 S.Ct. 3291, 87 L.Ed.2d 437] (1985) (per curiam)—that legal liability should not extend as far as factual causation. As a leading treatise explains, "[i]n a philosophical sense, the consequences of an act go forward to eternity," and extending liability as far as factual causation therefore "would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.' ... Some boundaries must be set to liability for the consequences of any act, upon the basis of some social ideal of

justice or policy." W. Page Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser and Keeton on the Law of Torts 264 (5th ed. 1984) (footnote omitted). 849 F.2d at 63. In that case, the Second Circuit held that a class action suit on behalf of the shareholders of six publicly-traded companies could not bring a RICO claim against the infamous Ivan F. Boesky for the decline of stock prices after Boesky's guilty plea to insider trading. The court held that plaintiffs could not establish that their injuries were proximately caused either directly or indirectly by Boesky's racketeering violation; thus, plaintiffs did not allege a claim upon which relief could be granted. *Id.* at 64–65. On the issue of whether defendant's actions were the proximate cause of plaintiffs' injuries, the court said the injuries were "too remote" to allow recovery. *Id.* at 65. "[T]he doctrine of proximate cause reflects social policy decisions based on shared principles of justice. Applying those principles, we conclude that Congress did not intend us to allow RICO recovery to plaintiffs with claims as attenuated as these." *Id.* This reasoning has been alluded to by other courts. *See National Enterprises v. Mellon Financial Services,* 847 F.2d. at 254 (any sensible interpretation of *Sedima,* as well as any sensible interpretation of principles of causation, precludes "boundless speculation" on causation requirement of RICO).

Therefore, in the case at hand, in order for the plaintiffs to allege a claim upon which relief can be granted, they must allege not only the elements of a RICO offense [ (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity], but also:

(5) injuries that establish plaintiffs as the real parties in interest; that is, that the plaintiffs are parties that suffered direct rather than indirect injuries at the hands of defendants; and

(6) injuries that were proximately caused by the RICO violations; that is, that the injuries caused by defendants were not so remote so as to be barred by the principles governing legal liability.

## IV.

Applying these requirements to plaintiffs' complaint, the Court finds that as a matter of law (1) plaintiffs are not the real parties in interest; and (2) plaintiffs' injuries were not proximately caused by the alleged RICO violation. As such, the complaint does not state a claim upon which relief can be granted.

■ On the issue of the real party in interest, the Court finds that the United States is the party that suffered the direct injuries at the hands of defendants and that the plaintiffs suffered indirect or secondary injuries. The RICO scheme alleged in the complaint defrauded the United States of money. The United States issued mortgage loan insurance on houses that were over-valued and destined to default. As a result, the United States issued payments to the mortgage lenders that it otherwise would not have issued. The injuries to the City of Milwaukee and the other plaintiffs, however, were at least one step beyond those of the United States. The damage to the neighborhood preservation policy, real estate and loan investment values, deterrence of criminal activity, and funds that would otherwise be used for other city projects came only after the United States had suffered the consequences of the scheme by insuring mortgage loans that it would not have otherwise insured. When the loans defaulted and the properties deteriorated, the United States suffered the direct financial consequences. It had to pay the mortgage lenders on the policies it had insured and it was stuck with the deteriorating properties. The City of Milwaukee certainly felt repercussions from the scheme, but only through the injuries to the United States. The neighborhood preservation policy suffered because the United States insured loans that were destined for default and would not have otherwise been insured; the neighborhood real estate and loan investment values decreased only because the investment of the United States decreased; crime festered in the City only at the same time it festered in the property,

or insured property, of the United States. Moreover, as to the plaintiffs' $40,000 cost of rehabilitating each property they acquired from the United States, that cost, by the nature of the scheme alleged, was duplicative of at least part of the damages to the United States. "Treble damages, not sextuple damages, are the penalty Congress selected." *Carter v. Berger*, 777 F.2d. at 1176. Thus, like the taxpayers in the Seventh Circuit's *Carter* case, the construction company supplier in the Fifth Circuit's *National Enterprises* case, the individual union members in the First Circuit's *Bass* case, and the corporate shareholders in the Sixth Circuit's *Warren* case, the Fourth Circuit's *NCNB National Bank* case, and the Second Circuit's *Rand* case, the City of Milwaukee and the two neighborhood organizations have no standing to bring RICO claims that derive from injuries directly inflicted on another party.[2]

■ Plaintiffs also fail on the issue of proximate cause. The complaint alleges at paragraph 32 that "as a direct result of defendants' scheme to defraud" the United States, the plaintiff suffered injuries. But the damage to the neighborhood preservation policy resulted only after the United States was defrauded on the loan applications and *after* the loans were insured by the United States and *after* the properties were defaulted by the buyers and *after* the properties deteriorated and no steps were taken to preserve them and *after* the United States took title to the properties. The same sequence had to follow before the damage resulted to the real estate and loan values of the neighborhoods at issue and before the damage resulted to the deterrence of crime (other than the crime of fraud). Furthermore, before the damage to the City's renovation program resulted, at least one other step had to take place: the City of Milwaukee had to acquire the property from the United States. The

Court finds that plaintiffs' characterization of the damages as a "direct result" of defendants' scheme is not supported by the allegations of the complaint. At best, the injuries alleged were indirectly caused. But, as with the injuries alleged in *Sperber v. Boesky*, such attenuated injuries that this Court cannot conclude that Congress intended to permit recovery under RICO.

To hold otherwise would be to open the floodgates to this type of private litigation by every body of government. The scenario is not hard to envision. The state, county, township, municipality, school board, etc. has a policy of encouraging something: housing or business or education or any of the hundreds of matters that governments involve themselves in. Tax dollars are put towards the policy. Then, when a RICO violation occurs within the area governed by the body, a law suit is ready-made. What crime does not affect where people live or whether the area's business will be healthy or whether tax dollars will be available for raises for teachers? For that matter, what crime, RICO included, does not affect how tax dollars are spent?

This is not to say that governmental bodies should be barred from bringing civil RICO claims. The wording of the statute has no such limitation and in fact expressly authorizes the United States Attorney General to bring such claims. Also, as discussed below, this Court has allowed recovery to the City of Milwaukee on past RICO claims. The point is that the ripples formed by the splash of a RICO crime inevitably touch the workings of governmental bodies and the well-being of its citizens. Courts should be particularly wary of RICO claims based on damages to a government's "policy."

### V.

Plaintiffs contend that its allegations in the complaint are similar to those in *City of*

---

**2.** The requirement of Rule 17 that the Court allow time for joinder or substitution of the real party in interest (here, the United States) appears academic in light of the nature of the interest alleged by plaintiffs. The requirement also appears moot in light of the Court's alternative ruling on the issue of causation. However,

in order to comply with the express wording of Rule 17, the Court will withhold the entry of judgment dismissing the case for a period of 10 days from the date of this order. During that time, plaintiffs may seek leave to substitute or join the United States through a motion for reconsideration.

*Milwaukee v. Hansen, et al.*, Case No. 77–C–246 (E.D.Wis.), wherein this Court allowed the City of Milwaukee to recover treble damages for costs incurred in fighting fires set by defendants as part of a RICO scheme. Plaintiffs urge the Court to follow its "pioneering" decision.

*Hansen*, however, was decided before the Supreme Court case of *Sedima* and the Seventh Circuit cases of *Haroco* and *Carter*, all of which this Court is now obligated to follow. Furthermore, in reviewing the June 11, 1980, and January 13, 1981, slip opinions of *Hansen*, the Court would hold to the belief that recovery of that type of claim would still be permitted today. The cost to the City in putting out fires started by arson was an injury wholly separate from the injuries to the private property owners. The cost did not arise solely because the property owner was injured; and the City did not seek damages—as it does here—for the decrease in the value of real estate in areas blighted by the burned-out buildings or for decreases in its tax base. Also, the causation link in that case was much stronger: defendants' scheme involved starting fires; the City had to put them out. Thus, the City's damages arose from the outset of the RICO scheme, not after the market values were depleted or until crime developed or until the City bought the property.

Therefore the Court finds its decision in *Hansen* distinguishable from the complaint at hand.

### VI.

The above analysis was based on interpretations of the federal RICO provisions. Plaintiffs complaint also alleges a claim under Wisconsin's RICO statute, for which this Court must turn to Wisconsin law for controlling interpretations. The Wisconsin RICO statute provides a private cause of action at § 946.87(4), Wis.Stats. That section provides:

> Any person who is injured by reason of violation of [the RICO laws] has a cause of action for 2 times the actual damages sustained and, when appropriate, punitive damages. The person shall also re-

cover attorney fees and costs of the investigation and litigation reasonably incurred. The defendant or any injured person may demand a trial by jury in any civil action brought under this section.

The research of the parties, as well as the Court, has uncovered no published interpretations of the Wisconsin RICO laws, which became effective in 1982. The Seventh Circuit, however, has remarked that "[t]he Wisconsin RICO statute is the closest counterpart in Wisconsin law to the federal RICO statute." *See Hemmings v. Barian*, 822 F.2d 688, 690 (7th Cir.1987) (discussing appropriate statute of limitations for federal RICO claim). Indeed, the two provisions are similar in both intent and structure. *Compare* § 946.81, *et seq.*, Wis.Stats. and 18 U.S.C.S. § 1961, *et seq.* (including excerpt from legislative history's "findings and purpose"). The Wisconsin RICO even incorporates the federal definition of racketeering activity. *See* § 946.82(4), Wis. Stats.

The question before the Court is whether the requirements for pleading a claim under the Wisconsin RICO provisions should be identical to the federal RICO requirements discussed above. Defendants urge such an analysis, arguing (1) that plaintiffs made no effort in their complaint to distinguish between the two claims, and (2) that the Wisconsin Supreme Court has given great weight to federal court interpretations of federal statutes in interpreting analogous provisions of state law (*citing, as examples, Department of Taxation v. Siegman*, 24 Wis.2d 92, 96–99, 128 N.W.2d 658 (1964) (looking to federal interpretations of "realized" and "taxable" for construction of taxable income provision of section 71.03(1), Wis.Stats.) and *In re Adams Machinery, Inc.*, 20 Wis.2d 607, 621, 123 N.W.2d 558 (1963) (stating "settled rule" that where Wisconsin adopts the language of a federal statute which has been construed by the United States Supreme Court, that construction becomes accepted in Wisconsin law)). Plaintiffs respond that under Wisconsin law, the issue of proximate cause is to be decided by the jury unless reasonable persons could not disagree (*citing Morgan v. Pennsylvania*

*General Insurance Co.*, 87 Wis.2d 723, 275 N.W.2d 660 (1979) and *Stewart v. Wulf*, 85 Wis.2d 461, 271 N.W.2d 79 (1978) (both discussing motions to dismiss in negligence case)).

To answer the question of whether the pleading requirements of the Wisconsin RICO statute are identical to the federal RICO law, the Court, under the rules of statutory construction, must give effect to the intent of the Wisconsin legislature. *Marshall–Wisconsin Corporation v. Juneau Square*, 139 Wis.2d 112, 133, 406 N.W.2d 764 (1987). In determining that intent, the Court first looks to the language of the statute itself. *Id.* If the meaning of the statute on the question before the Court is plain, the Court goes no further. *Id.* However, if the language of the statute is unclear or ambiguous, the Court may look to outside sources to aid statutory construction. *Id.* "Where one of several interpretations is possible, the legislative intent is ascertained from the language of the statute in relation to its context, subject matter, scope, history and the object intended to be accomplished." *Qasem v. Kozarek*, 716 F.2d 1172, 1177 (1983) (*citing Terry v. Mongin Insurance Agency*, 105 Wis.2d 575, 584, 314 N.W.2d 349, 353–54 (1982)). In the case at hand, the rule on resort to outside sources is clouded somewhat since the language of the Wisconsin RICO includes the intent of the state legislature, § 946.81, Stats., and incorporation of a federal RICO provision, § 946.82(4), Stats.

The Court finds that the requirements for a claim under the federal RICO law apply to a claim under the Wisconsin law except where the Wisconsin legislature expressly chose alternative requirements. This interpretation is based on the intent of the Wisconsin legislature, the wording and structure it chose for its law, the specific incorporation of a federal RICO provision, and a comparison of the Wisconsin and federal law. In particular, the Court notes that where the Wisconsin legislature intended to depart from the already-established federal model, it clearly did so. *See* 946.86(4) (providing that injured party may recover double instead of triple damages and further providing no requirement that the injury be to business or property).

Under the Wisconsin RICO provisions, no relevant alternative requirements are expressed for the principle elements of a RICO offense, including the directness or causation of the injury. Therefore, the Court holds that the analysis above on the federal RICO claim applies equally to the Wisconsin RICO claim.

### VII.

The dispositive issues in this decision were raised by the mortgage lenders, but adopted by some other, but not all, defendants. In any event, the Courts' ruling applies to the plaintiffs' case against all defendants since plaintiffs alleged in the complaint that all defendants were liable for the scheme to defraud the United States. As such, the Court, *sua sponte*, will incorporate all defendants into the mortgage lenders' motion to dismiss for failure to state a claim upon which relief may be granted.

### VIII.

The Court's decision herein is in no way meant to condone the alleged activity of the defendants—some of who received criminal convictions for their roles. The Court also does not intend to diminish the effects of the scheme, however attenuated, on the City of Milwaukee and the other two plaintiffs. The Court commends the aggressiveness of the City Attorney in seeking to protect the interests of the City. This Court, however, has its own obligations and they include following the controlling precedents of the United States Supreme Court and the United States Court of Appeals for the Seventh Circuit. The interpretations of those courts, as well as the persuasive interpretations of other appellate courts, dictate that despite the broad language of the RICO laws, not every injury traceable to a RICO violation is recoverable. The law requires that the Court stop the ripples of recovery at a point consistent with the intent of the Congress (and the Wisconsin legislature) and

consistent with the interests of justice. In the case at hand, that stopping point forecloses recovery by the plaintiffs.

Accordingly, based on the decision above, the Court GRANTS the defendants' motion to dismiss the case under Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. The case is hereby DISMISSED with prejudice.

Pursuant to the requirements of Rule 17, Fed.R.Civ.P., *see* footnote 2, *supra,* the Court will withhold the entering of judgment for a period of 10 days from the date of this decision.