BRUNSWICK CORPORATION,
MERCURY MARINE
DIVISION, Plaintiff,

v.

E.A. DOYLE MANUFACTURING COMPANY, Marquip Corporation, Schreier Malting Company, Kenneth J. Kazmierczak, Thomas R. Testwuide, and Carl R. Marschke, Defendants.

No. 87–C–224.

United States District Court,
E.D. Wisconsin.

Aug. 22, 1991.

Quinn W. Martin, Mark A. Kircher, Jeffrey K. Spoerk, Quarles & Brady, Milwaukee, Wis., for plaintiff.

Michael Ash, John L. Kirtley, Godfrey & Kahn S.C., Milwaukee, Wis., for defendants.

## DECISION AND ORDER

AARON E. GOODSTEIN, United States Magistrate Judge.

This law suit arose out of a business misadventure known as the E.A. Doyle Manufacturing Company. Ed Doyle, founder of the company, had a bright idea, an integrated, robot controlled, trim press operation for automated die cast production, but an apparently bad sense of accounting. Consequently, when the defendants invested in Ed Doyle's company, they got more than they bargained for: a desk drawer full of undisclosed liabilities. Nevertheless, the defendants, already successful businessmen, were committed to the new company. Meanwhile, the plaintiff, Mercury Marine, was moving forward with a plan to buy a robot for its die cast production from Long & Ellison, a company which also supplied the Doyle Company with the robots used in the integrated trim

press. The Doyle Company, under the defendants' leadership and with the cooperation of Long & Ellison, persuaded Mercury Marine that rather than just purchasing a robot, Mercury Marine should buy one of the Doyle Company's fully integrated systems. Some time later, with around $60,000 in downpayment from Mercury Marine, and well over $200,000 worth of robots bought on credit from Long & Ellison, the defendants turned the keys of the Doyle Company over to the bank, and ceased operations.

The case is now before the court subsequent to a jury trial and verdict in favor of the plaintiff. The plaintiff brought suit against the defendants, alleging breach of contract with common law tort of intentional interference with contract, fraud, taking under false pretense/conversion and violations of the federal "RICO" (Racketeer Influenced Corrupt Organizations Act) law, 18 U.S.C. §§ 1961–1964 and Wisconsin's "little RICO", WOCCA (Wisconsin Organized Crime Control Act), Wis.Stat. §§ 946.-80–86. The defendants moved to dismiss all five counts of the complaint, and on November 10, 1987, all counts except the RICO, WOCCA and intentional interference with contract counts were dismissed. Subsequently, the parties consented to the exercise of jurisdiction by a magistrate judge, 28 U.S.C. § 636(c) and the case was transferred by Judge J.P. Stadtmueller on February 8, 1990, to this court for resolution. Commencing September 11, 1990, a jury trial was conducted on the remaining counts, and a verdict returned in favor of the plaintiff, with damages awarded in the amount of two hundred and two thousand, one hundred fifty one dollars and forty cents ($202,151.40).

Now pending before the court is a motion by all the defendants except E.A. Doyle Company,[1] for judgment notwithstanding of verdict under Rule 50, Fed. R.Civ.P., or in the alternative, for a new trial under Rule 59(a), Fed.R.Civ.P. on the two racketeering claims (RICO and WOCCA) and on the intentional interference

with contract claim. If no other relief is granted, the defendants seek to alter or amend the judgment under Rule 59(e), Fed. R.Civ.P. to eliminate the treble damage award or, at the very least, to eliminate the award of interest on top of treble damages.

## I. Motion for Judgment Notwithstanding the Verdict

In reviewing a jury verdict on a Rule 50 motion for judgment notwithstanding the verdict, "all the evidence, taken as a whole, must be viewed in the light most favorable to the non-moving party. This evidence must provide a sufficient basis from which the jury could have reasonably reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts." *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.,* 898 F.2d 512, 515 (7th Cir.1990); quoting *Selle v. Gibb,* 741 F.2d 896 (7th Cir.1984). A motion of for judgment notwithstanding the verdict raises a question of law. *David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.,* 897 F.2d 288, 291 (7th Cir.1990).

## A. RICO–Judgment Notwithstanding the Verdict

■ The plaintiff alleged a violation of § 1962(c) of RICO, which requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The defendants argue that they are entitled to judgment notwithstanding the verdict since there were insufficient facts to support the element of *pattern* of racketeering under RICO. In particular, the defendants contend there was no requisite threat of continuity.

The trial in this case was held during a period in which there is a climate of change surrounding civil RICO litigation. In an article which appeared in the *Wall Street Journal* the day the jury returned its verdict, and which, no doubt, is of little solace

---

1. The parties agree that default judgment should be entered against the now defunct E.A. Doyle Company.

to the defendants, the reporters noted that Congress was considering limiting the use of RICO for "garden variety commercial disputes." P. Barrett and N. Barsky, *Wall Street Journal*, September 19, 1990 at B12. Of substantially more solace to the defendants, perhaps, are the recent Seventh Circuit cases, including *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir.1990), in which the court held that RICO does not apply to garden variety commercial dispute. The defendants assert that this case presents nothing more than a garden variety commercial dispute, with one scheme, one proven victim, one distinct injury, that any predicate acts were related to a single contract between Mercury Marine and Doyle Company, and consequently, that there is no threat of continued criminal activity. The plaintiff, obviously, disagrees.

The question of whether a pattern of racketeering existed under the facts alleged by the plaintiff is not new to the court or any of the parties. The issue was raised in motions for summary judgment and directed verdict, and the court indicated that the requisite element of a pattern was dependent upon the construction of the facts alleged, thus an issue for the jury. During consideration of the defendants' motion for directed verdict, the court indicated to the parties that there was a genuine concern regarding the pattern requirement in view of the recent Seventh Circuit case, *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir.1990).

Rule 50(b), Fed.R.Civ.P., providing for judgment notwithstanding the verdict, was enacted in the desire to permit a trial court to resolve any doubt as to the sufficiency of the evidence subsequent to the rendition of the verdict, thereby placing the case in such a posture that, in the event it should be concluded upon review that the court erred in directing a verdict, the original verdict may be reinstated without a new trial. *Shaw v. Edward Hines Lumber Co.*, 249 F.2d 434 (7th Cir.1957). Furthermore, this rule provides a procedure which gives the trial judge adequate opportunity to properly scrutinize the record and to make informed, considered rulings. *Id.*

Regarding the motion for directed verdict, it was this court's belief that based upon the multifactor test for continuity outlined in *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986), even in light of *Olive Can*, the facts could be construed to create an issue for the jury. Upon a thorough review of the evidence and giving consideration to the most recent Seventh Circuit decisions concerning the pattern requirement, this court now finds that there was insufficient evidence to support the jury's verdict, and consequently the court grants the defendants' motion for judgment notwithstanding the verdict on the RICO and WOCCA causes of action.

### The "Pattern" Element Under RICO

■ In order to satisfy the *pattern* element, there must be proof of a relationship between the predicate acts and *an actual or threatened continuity of racketeering activity.* *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989). Since neither party in this case disputes that the alleged predicates meet the relationship requirement, the crucial inquiry is whether there was proof of the continuity element.

■ Continuity of racketeering activity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.*, 109 S.Ct. at 2902. Alternatively, a party may prove a pattern of racketeering activity by proving a "specific threat of repetition extending indefinitely into the future" or that the "predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 2902. No one factor is determinative; rather, courts must examine the facts of each case to

determine when the threat of long term criminal activity is present. *Olive Can*, at 1151.

The Seventh Circuit has enumerated four factors to consider in determining the threat of continuing racketeering activity under RICO: (1) the number and variety of predicate acts and length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and, (4) the occurrence of distinct injuries. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986). A "pattern," however, may involve a single scheme or multiple schemes, a single victim or multiple victims, and the mere proof of multiple schemes or multiple victims does not prove a pattern. *H.J. Inc.*, 109 S.Ct. at 2901; *Hartz v. Friedman*, 919 F.2d 469, 472–473 (7th Cir.1990); *See also Olive Can*, 906 F.2d at 1147 (multiple victims, but no pattern). Consequently, application of the *Morgan* factors has not been straightforward, and at best, the *Morgan* factors are a guide, tempered by common sense. *See H.J. Inc.*, 109 S.Ct. at 2901.

The court notes, furthermore, that the most recent civil RICO case in which the Seventh Circuit affirmed a finding of continuity was *Ashland Oil Inc. v. Arnett*, 875 F.2d 1271 (7th Cir.1989), which preceded the Supreme Court decision in *H.J. Inc.* Since the Supreme Court decision in *H.J. Inc.*, the Seventh Circuit has decided several civil RICO cases, and, in every case concluded that the element of continuity was lacking. *Hartz v. Friedman*, 919 F.2d at 472 (collecting cases); *J.D. Marshall International v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir.1991). Nevertheless, *Ashland Oil* has been discussed with renewed approval in Seventh Circuit opinions subsequent to *H.J. Inc. See Olive Can*, 906 F.2d at 1152; *Hartz*, 919 F.2d at 472.

*Ashland Oil* is especially noteworthy in that the Seventh Circuit distinguished the fraud in *Ashland Oil* from "ordinary business fraud" based upon the nature and variety of predicate acts committed by the defendants (arson, bankruptcy fraud, wire fraud). *Ashland Oil* at 1279. In fact, a review of *Ashland Oil* and the subsequent

Seventh Circuit civil RICO cases which address the continuity requirement, reveal that in order to find continuity in a civil RICO case, perhaps the most significant aspect of a pattern is the nature of the enterprise or scheme(s), which includes the objective(s) of the enterprise, natural limits to the objective(s), and the means used to accomplish the objective(s).

In *Ashland Oil*, the plaintiffs sued under RICO, alleging that a petroleum wholesale corporation induced the plaintiffs to extend credit by mailing a false financial statement showing the company to be in sound financial condition when it was not. The defendants' alleged objective was to increase their personal wealth. The nature of the "product theft" enterprise was to expand the company's assets at the expense of the plaintiffs, and then to divert these assets or their proceeds through intermediary corporations to the defendants. The defendants in *Ashland Oil* made payments to themselves from the assets of the failing company. These payments were not in fulfillment of legitimate business obligations, and the evidence discussed by the court suggests that one defendant, Toy Arnett, made a net gain of approximately $108,000, at the expense of the plaintiffs. *Ashland Oil*, at 1275. The defendants furthered their scheme by burning records and committing fraud on a bankruptcy court to prevent discovery.

The Seventh Circuit found a pattern of racketeering in *Ashland Oil*, where the enterprise was active for a period of only four months but posed a threat of future criminal conduct. The Seventh Circuit indicated that *Ashland Oil* involved a pattern of racketeering because of (1) the number of victims (four) flowing out of independent sequential actions, and (2) the use of several unlawful means, including bankruptcy fraud and arson, as distinct from the ordinary business fraud case. The finding of independent sequential actions, each resulting in a new victim, suggests that there was no natural limit to the scheme since each "product theft" was independent and served a limitless objective—stealing money, apparently hoping to become increasingly more wealthy. *Olive Can*, 906 F.2d

at 1152. Furthermore, the involvement of bankruptcy fraud and arson suggests the sort of egregious criminal behavior which poses a "more significant social threat," or a lawlessness which threatens repetition. *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1269 (7th Cir.1990); *Ashland Oil*, 875 F.2d at 1279; *Olive Can*, 906 F.2d at 1152.

In contrast, the Seventh Circuit found no threat of continuing racketeering activity in *Olive Can v. Martin*, 906 F.2d at 1147. The court acknowledged that the nature of the enterprises in *Olive Can* and *Ashland Oil* were facially similar, in that both cases involved seemingly the same objective, to "expand the company's assets at the expense of the plaintiffs, and then to funnel those assets or their proceeds to the [defendants] through [an] intermediary also owned and controlled by them." *Id.;* quoting *Ashland Oil*, 875 F.2d at 1272. Also, the court noted that both cases involved four different victims with several injuries flowing from different acts at different times. *Olive Can* at 1152.

Nevertheless, the court in *Olive Can* distinguished *Ashland Oil* based upon differences the court perceived in the objective of the enterprise and the existence of a natural ending point to the objective of the enterprise, as well as differences in the lawlessness of the means employed. Specifically, in *Olive Can*, the court found that the objective of the scheme was limited to decreasing a liability (paying off a business loan), whereas *Ashland Oil* involved increasing the defendants' assets. This was significant because decreasing liabilities has a natural ending point when the debt is paid off, whereas increasing assets does not. Furthermore, the means employed in *Olive Can* were limited to mail and wire fraud. *Olive Can*, 906 F.2d at 1152.

Turning to the facts of this case, the court finds that the plaintiff has failed to sustain its burden of presenting any facts upon which a jury could reasonably have concluded, without speculating or drawing unreasonable inferences, that the alleged enterprise demonstrated long term criminal activity as a closed-ended scheme, or posed a threat of long term criminal activity as an open-ended scheme.

### The E.A. Doyle Manufacturing Company Enterprise—Nature of the Enterprise

The defendants' enterprise was alive for a seven month period, starting with the purchase of the Doyle Company in February, 1986, and ending upon the termination of business in August, 1986. A period as brief as four months can sustain a pattern of racketeering when there is a threat of future criminal conduct. *Ashland Oil* 875 F.2d at 1278; *Olive Can*, 906 F.2d at 1151. However, *absent a threat of future criminal conduct,* seven months is not a substantial period of time, particularly when the predicate acts are mail and wire fraud which may involve thousands of letters and telephone calls all only tangentially related to the single ultimate scheme to defraud. *See, Ashland Oil*, 875 F.2d at 1278; *Olive Can*, 906 F.2d at 1151.

In *Ashland Oil*, the court perceived a threat of future criminal conduct because of the egregiousness of the means, and the unlimited nature of the objective. Unlike the Arnetts' enterprise in *Ashland Oil*, however, the Doyle Company was not a get rich quick scheme.

### Conduct Within the Limited Duration of the Enterprise—Neither Egregious nor Repetitious

As discussed above, a party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months do not satisfy this requirement. A party may alternatively prove a pattern of racketeering activity by proving that the means employed pose a significant social threat which, by demonstrating a disrespect for lawful behavior, threatens repetition.

An examination of the defendants' conduct proven by the plaintiff convinces this court that the defendants' conduct was sufficiently limited in duration and audacity

that it did not inherently threaten repetition.

Although it is undisputed that Long & Ellison and Mercury Marine lost substantial sums to the Doyle Company, the only evidence of direct payments out of the Doyle Company to the defendants were the payments of business obligations in the form of loan repayments on several short term loans which were made to the Doyle Company by the defendants. There were also what could be characterized as indirect payments to the defendants when the Doyle company made payroll and payroll tax payments, thus preventing the defendants from having to later make these payments. *Cf. Ashland Oil* 875 F.2d at 1275. Mercury Marine argues, however, that these were not *legitimate* business obligations, and that the payments of these business obligations, when other business obligations went unpaid, were so improper, or so rewarding, as to suggest a threat of future criminal conduct. The court concludes, however, that the improprieties proven by Mercury Marine, at most, amount to "garden variety fraud," and are not the sort of egregious criminal conduct of *Ashland Oil*, which displayed a disregard for lawful behavior and consequent threat of repetition.

■ Substantial evidence was presented of allegedly preferential payments made to Schreier Malting in repayment of short term loans using Doyle Company assets. The plaintiff has argued that this was a scheme to withdraw assets from Doyle.

Between June 26, 1986 and August 18, 1986, Schreier extended to the Doyle Company a total of seven loans, each requiring as a term of the loan, repayment 30 days after the date of the loan. The Doyle Company repaid, on a timely basis with 9% Annual Percentage Rate interest (pursuant to the terms of the loan) each of the four loans extended by Schreier Malting in June and July, totalling $64,000 in principal.

Between August 1, 1986 and August 18, 1986, Schreier Malting extended $80,000 in loans to the Doyle Company. Only a single payment was made subsequent to the final, August 18, 1986 loan; on August 25, 1986,

the last day the Doyle Company was in business, the Doyle Company made an early payment on the August 1, 1986 loan. This payment, $13,000 on a $30,000 loan, left a net loss incurred by Schreier Malting of $67,000, on loans extended between August 1, 1986 and August 25, 1986.

Initially, the court notes that Schreier was never obliged to make loans to the Doyle Company but did so allegedly in an effort to save a floundering company. The court also notes that the last payment on the loans extended in June and July was made on August 18, 1986; the same day Schreier Malting extended another, albeit the last, loan to the Doyle Company. It is doubtful that Schreier Malting would have extended any loans in August had the Doyle Company not paid Schreier Malting on the four loans made in June and July.

Regardless of whether Schreier Malting would have continued making loans if the Doyle Company had defaulted on the earlier loans, the fact remains that the plaintiff is attempting to support its RICO claim with evidence of $77,000 of payments from the Doyle Company to Schreier Malting, when in the same period, Schreier Malting made $144,000 of payments to the Doyle Company, and this amount is notwithstanding the additional $410,000 loss Schreier incurred on their loan guarantee, or the loss incurred on their initial investment in the company. Furthermore, the most egregious of these payments was the one time prepayment of $13,000 on a $30,000 loan, which could, arguably, have been overturned had the Doyle Company entered bankruptcy. Doyle, however, did not enter bankruptcy. These allegations concerning the loan repayments simply aren't the warts that make a hog into a RICO dragon. *J.D. Marshall International v. Redstart, Inc.,* 935 F.2d at 821 ("Adding more warts to the hog still does not make it a dragon.")

■ The plaintiff also asserts that the liquidation of certain assets to pay business obligations was another means by which the defendants profited at the Doyle Company and plaintiff's expense, and that the liquidations constituted improper conduct, threatening repetition. On August 21,

1986 the decision was made that the Doyle Company would close. At that time, a decision was made that Schreier would purchase an automobile from the Doyle Company for $12,900, and the proceeds would be used to make the $13,000 prepayment to Schreier on the August 1, 1986 loan. Although the prepayment of the loan carries an aura of impropriety, and may have been overturned had Doyle gone into bankruptcy, the sale of the car itself does not create the same impression. The car was sold at fair market value and the car, specifically exempt from the bank's security agreement, was unsecured property.

In contrast, however, the defendants also decided on August 21, 1986, that the defendant, Marquip Corporation, would pay for a robot which was being kept at the Marquip factory, but which was owned by the Doyle Company, subject to a security interest held by the bank. The proceeds of the sale, $42,500, were then used to pay payroll and payroll taxes.

The plaintiff asserts that the liquidation of the robot was improper because the robot sale represented the sale of an asset in which the bank had a security interest. The plaintiff argues that this sale was especially unseemly since the proceeds were used to avoid shareholder liability for wages and payroll taxes.[2] The plaintiff asserts that had the robot not been purchased by Marquip, the defendants would have been personally liable for the payroll debt, and also that the sale of a secured asset is indicative of the sort of improper behavior which amounts to a continuing threat of racketeering.

Initially, the court points out that the money was used to meet payroll and tax obligations, which are legitimate business expenses. Unlike debts incurred in the ordinary course of business, the Wisconsin legislature and the U.S. Congress have mandated the priority payment of wages and taxes. These laws are not intended as a means for aggrieved creditors to pierce the corporate veil by insisting that the payments be made from shareholder assets, but rather, are intended to assure that laborers' wages are timely paid. *See,* Wis. Stat. § 180.40(6); *Joncas v. Krueger,* 61 Wis.2d 529, 213 N.W.2d 1 (1974) (statute to be interpreted with favor to laborers); 11 U.S.C. § 503 and § 507(a)(3) and House Judiciary Report, No. 95–595, U.S.Code Cong. & Admin.News 1978, p. 5787 ("it would be appropriate to pay all wage claims [subsequent to bankruptcy] as soon as practicable, even before all administrative expenses were determined, because most often the employees that worked for the failing enterprise will need the money they receive in payment of their claims to live on").

Nevertheless, it is the manner in which the defendants paid these debts which the plaintiff asserts is improper. Indeed, the sale of the robot may have deprived the bank of a secured asset, although there was no evidence that the bank's security interest went unsatisfied. Furthermore, even accepting that the defendants avoided personal liability for wages in an amount equal to the price of the robot, this is not the sort of egregious criminal behavior sufficient to raise the defendants' scheme to the level of a continuing threat of racketeering.

As with the early repayment on August 25, 1986, of $13,000 on the August 1, 1986 loan, the liquidation of the robot occurred on the eve of closing Doyle's doors. Schreier Malting extended a $30,000 short term loan to the Doyle Company in order to meet payroll and payroll tax obligations three days prior to the decision to liquidate the robot. This again indicates that, in the same time frame that the defendants are alleged to have been siphoning Doyle Company assets, they were pumping assets into the company. However, the picture which the plaintiff attempts to paint with the liquidation of the robot and the car is one of a desperate attempt to curb the defendants' losses in the final hour. In fact, the evidence indicates that the defendants acted pursuant to the advice of legal counsel suggesting means of minimizing further losses. The means by which the defen-

---

**2.** Marquip purchased the robot for $42,500, which was roughly list price, and it has never been suggested that Marquip paid an unfair price for the robot.

dants ultimately sought to reduce their losses on the eve of closing does not display the sort of egregious criminal behavior which indicates a reckless disregard for legality and which threatens to be repeated in the future. *Cf. Ashland Oil,* 875 F.2d at 1279.

There is no inherent threat of repetition in the defendants' acts. The plaintiff has pointed to several actions of the defendants as suggesting the threat of repetition. The early repayment of the loan on August 25, 1986, facilitated in part by the sale of the automobile, was not flagrant criminal behavior, nor did the loans financially benefit the defendants. Had the Doyle Company entered bankruptcy, the sale of the robot would have been subject to challenge. No bankruptcy proceedings were commenced; nor has it been shown that the bank was unable to recoup the amount of security it had in the robot. This transaction amounted to a one time effort to reduce the defendants' losses. Finally, the "fraud" executed upon Long & Ellison and Mercury Marine, while ostensibly reducing the defendants' liabilities, was accompanied by a concurrent period when the defendants were themselves increasing their own liabilities in the Doyle Company. Common sense says this just wasn't a racketeering scheme.

### Conduct Beyond the Limited Duration of the Enterprise–Limited Objectives with a Natural Ending Point

■ This "common sense" approach is bolstered by a consideration of the defendants' conduct in light of the "open ended, closed ended" considerations enunciated in *H.J. Inc.* As discussed above, continuity may exist if there is a specific threat of repetition extending indefinitely into the future (implying an unlimited objective with no natural ending point) or if the predicate acts are part of an ongoing entity's regular way of doing business. *See H.J. Inc.,* 109 S.Ct. at 2902; *Olive Can,* 906 F.2d at 1151. The parties have suggested several scenarios, but under any characterization of the evidence which has been posited, the defendants' objectives were limited and had a natural ending point.

First, under the plaintiff's theory that the defendants benefitted from preferential payments by reducing their liability before closing the company, the court notes that the scheme was certainly closed ended, and it had a natural ending point when the Doyle Company closed on August 25, 1986. Consequently, there was no threat of repetition.

Next is the "new start" theory. It has been argued that the defendants knew that the Doyle Company was insolvent and the end was near, and thus they were attempting to concentrate their assets and streamline and refine the automated trim press concept before closing, with hopes of a fresh, new start; again, the alleged criminal activities were only closed ended with a natural endpoint occurring at the close of the Doyle Company. Thus, there was no inherent threat of repetition. Furthermore, this "scheme," to hold creditors at bay, get robots in hand, refine the product, and sink enough of their own money into the company to accomplish this objective, is the sort of limited objective discussed and dismissed in *Olive Can.* Finally, for continuity purposes, to argue that the ultimate objective of the scheme was to close the Doyle Company and make a fresh start with a new automated trim press company is to also argue that the fraud perpetrated upon Mercury Marine and Long & Ellison constituted the defendants' "regular way of doing business." However, since fraud was not Doyle's regular way of doing business, this theory does not satisfy the pattern requirement.

There is also the "continuation of Doyle by duping the creditors" theory. Here, if the court stretches its imagination enough, it is possible that the defendants intended to sink a lot of their own money and almost as much of everyone else's money into developing a marketable automated trim press. This would be accomplished by refining the automated trim press, reorganizing Doyle's debt or convincing creditors to accept token payments and then continuing the existing Doyle Company. This would constitute an open ended plan, but it is not one which is capable of repetition unless

creditors are continually willing to extend goods to the same company with less than full payment. All the evidence indicates that the Doyle Company was on the brink of being forced to close by its creditors—it would be extreme speculation to think otherwise. Likewise, speculation is required to conclude that, if the Doyle Company had remained open, it could have done so without delivering the plaintiff's robot and paying Long & Ellison. Furthermore, the defendants did not in fact continue the "Doylemation" business in any form, making this business theory even more speculative. Regardless of how tenuous this continuing business theory may be, however, it still produces only a scheme of limited duration; it ends when Doyle is forced into bankruptcy, has exhausted its credit or the defendants' resources, or when Doyle would have been ready to produce the new and marketable product. Again, if the court accepts this characterization of facts, this scenario would be controlled by *Olive Can*, wherein the defendants' *purpose* in perpetrating the fraud was limited to the continuation of the legitimate business, and acknowledge that fraud is not the defendants' regular way of doing business.[3]

Finally, if the court accepts the scenario which the defendants advance, that they believed they could succeed if they could sufficiently capitalize the Doyle Company, but eventually just gave up, again there is no threat of continued racketeering. The representations which the plaintiff asserts were fraudulent would, in fact, not be misrepresentations since the defendants' intended to do all they said they would. The only improprieties under this scenario occurred in the last week of Doyle's existence, and are not of a nature that they threaten repetition.

A significant failure in the plaintiff's case is the lack of any evidence that the enterprise or any member of the enterprise reaped an overall benefit from the activi-

ties of the enterprise.[4] There was no evidence that the defendants took out of the enterprise more than they put in, nor was there any evidence that the defendants had a disregard for lawful behavior or were predisposed to criminal acts which might be repeated.

As a final note to the plaintiff's RICO claim, the court points out that at the real heart of this dispute is the plaintiff's interference with contract claim: that the defendants crossed the line of proper business practices to induce the rewriting of the Mercury–Long & Ellison contract into a Mercury–Doyle–Long & Ellison deal. Beyond that, the plaintiff's claim amounts to little more than a complaint that they and other creditors were led into a sense of false security when the defendants collectively threw their abilities and financial support into the Doyle Company, creating a false impression that Doyle was a viable entity—for what rational businessman throws good money after bad? *See, In the Matter of EDC, Inc.*, 930 F.2d 1275, 1280–81 (7th Cir.1991). As noted in *EDC*, people do lend money to bankrupt firms, and the rational decision-maker may decide to throw good money after bad. Claims of mail fraud and wire fraud delve into the depths of extravagant rhetoric, which, if taken as plaintiff desires, "would put federal judges in the business of creating new crimes; federal criminal law would be the nation's moral vanguard." *EDC*, at 1281.

As Posner, J. states in *EDC*, at 1281, "American companies are criticized, rightly or wrongly, for being too quick to liquidate unprofitable plants and throw the workers out of their jobs and their communities into turmoil." *Id.* The defendants gambled on not closing the Doyle Company the day they discovered the grim financial picture, and instead infused more capital in an attempt to succeed with what both they and the plaintiff believed to be a good idea.

---

3. There was ample evidence in the record which indicates the Doyle Company's legitimate efforts to sell and deliver these systems, including the hiring of additional people in sales and engineering.

4. Undoubtedly there exists the unlucky or the unskilled criminal who loses money in their illegal efforts. However, the fact that these defendants lost money, *and* did not engage in egregious criminal conduct suggests the enterprise will not continue.

The gamble failed, and they lost more money than if they had quit months earlier and never travelled down this troubled road. The treble damages of RICO were not intended to sanction this sort of behavior; the cost of the gamble should deter bad risks, and the payoff for success is enough to encourage good risks. Accordingly, the court will grant the defendants' motion for judgment notwithstanding the verdict on the RICO claim.

### B. WOCCA–Judgment Notwithstanding the Verdict

■ The plaintiff asserted in its motion for directed verdict that WOCCA, the Wisconsin Organized Crime Control Act, Wis. Stat. §§ 946.80–.86, applies a different standard for the pattern requirement. WOCCA, § 946.82(3), Wis.Stat., defines a "pattern of racketeering" as "engaging in at least 3 incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, provided ... the incidents occurred within 7 years ..." This definition is similar to the RICO definition, but does not precisely track the federal definition. In particular, the state law provides for three predicate acts, they must be within seven years of each other, and they must be interrelated.

The plaintiff asserted in its motion for directed verdict that this effectively eliminated the continuity test found in the federal RICO law. The court, however, found that the continuity requirement for a pattern of racketeering found in federal law applied to Wisconsin's RICO law. The Wisconsin Court of Appeals noted in *State v. Judd*, 147 Wis.2d 398, 433 N.W.2d 260, 261 (App.1988), that since WOCCA was patterned after RICO, that federal law concerning RICO may be persuasive authority as to the interpretation of WOCCA. In *Milwaukee v. Universal Mortg. Corp.*, 692 F.Supp. 992, 1001 (E.D.Wis.1988), the court held that the requirements for a claim under the federal RICO law apply to a claim under WOCCA, except where the Wisconsin legislature expressly chose alternative requirements. This finding was based upon the observation that where the Wisconsin legislature intended to depart from the well delineated federal model, it clearly did so. *Id.; accord, Pillar Corp. v. Enercon Industries Corp.*, 694 F.Supp. 1353, 1360 (E.D.Wis.1988).

Accordingly, this court found that the minor differences in WOCCA, requiring three interrelated predicate acts in a seven year time period, did not constitute an intent to depart from the relationship plus continuity requirement found in federal RICO claims. In fact, it seems that Wisconsin's intent to incorporate a relationship plus continuity requirement is even more clear than in the language of the federal law, since more predicates are required, they must be interrelated, and they must be within a set time period.

The plaintiff, in its response filed in opposition to the motion for judgment notwithstanding the verdict has not asked the court to revisit its prior holding, finding that the analysis for continuity under RICO applies equally to the plaintiff's claim under WOCCA. Thus, in accord with this court's earlier ruling finding that the relevant analysis for a racketeering pattern under WOCCA is the same as under RICO, the court grants judgment notwithstanding the verdict on the WOCCA cause of action.

### C. Interference With Contract— Judgment Notwithstanding the Verdict

The defendants assert that judgment notwithstanding the verdict should be granted on the plaintiff's interference with contract claim as well. In the alternative, the defendants argue that a new trial should be granted.

Wisconsin recognizes a common law claim for inducing a third person not to perform a contract with another, unless the individual is privileged to do so. *Harman v. La Crosse Tribune*, 117 Wis.2d 448, 344 N.W.2d 536 (Ct.App.1984). Wisconsin courts have adopted the Restatement (Second) of Torts with respect to tortious interference with contract claims. *Liebe v. City Finance Company*, 98 Wis.2d 10, 15–16, 295 N.W.2d 16 (Ct.App.1980); Restatement (Second) of Torts §§ 766, 767 (1991); *Allen*

**1364**

*& O'Hara, Inc. v. Barrett Wrecking, Inc.,* 898 F.2d 512 (7th Cir.1990).

 Initially, the court notes that the defendants assert that the admission of testimony by Chuck Long and Kent Lorenz, from Long & Ellison, was improper as it relates both to the RICO and WOCCA claims and to the interference with contract claim. The defendants claim the testimony should have been excluded on the grounds of undue surprise. However, these witnesses were identified in the plaintiff's first final pretrial report which was submitted well over a year in advance of this trial, and their testimony was predictable. The defendants also raise an objection to Chuck Long's and Kent Lorenz' opinions that Testwuide lied to them, and that Testwuide was building the Doyle Company inventory in anticipation of closing the Doyle Company. The jury was required to consider whether 1) the defendants intended to interfere with the performance of the Doyle–Mercury contract and 2) whether such interference was motivated by a desire to promote the Doyle Company, and thus within the conditional privilege of the directors of the Doyle Company, or whether they acted out of some ill-motive. Consequently, the defendants' state of mind is at issue, and Lorenz' and Long's opinions, based upon their extensive dealings with the Doyle Company and with Testwuide in particular, could assist the jury in determining the defendants' motives, and their intent for the Doyle Company. *See* Fed. R.Evid. 701, and Restatement (Second) of Torts § 767. The court stands by its ruling that their testimony was properly admitted.

The jury determined that 1) the defendants intentionally interfered with the contractual relationship between the Doyle Company and Mercury Marine, 2) that the interference was not justified, and 3) that such interference caused damage to the plaintiff.

The basis of the interference claim originated in March of 1986 when Mercury Marine agreed to purchase a robot from Long & Ellison to be used in its trim press process. Mercury Marine issued a purchase order for the robot, valued at $60,890; 50% of the purchase price would be paid in two payments before delivery, 40% on delivery, and the remaining 10% once the system was operating. Long & Ellison previously had dealings with the Doyle Company, and in June, 1986 negotiations evolved between Mercury Marine, the Doyle Company and Long & Ellison.

The Doyle Company wanted to sell an integrated trim press operation to Mercury Marine, using the same robot Mercury Marine had ordered from Long & Ellison. As envisioned, the idea was simple—Mercury Marine and Long & Ellison cancel their existing purchase contract, Long & Ellison sells the robot previously ordered by Mercury Marine to the Doyle Company, at the same price; the Doyle Company then adds a trim press and the necessary integrating hardware and software, and delivers a package system to Mercury Marine.

The defendants assert that all three companies stood to benefit from this relationship. Long & Ellison had the prospect of selling more robots if the Doyle Company could succeed with their integrated trim press, and at a minimum, Long & Ellison would be selling the same equipment at the same price to Mercury Marine, via the Doyle Company. Mercury Marine would get a package that would link its robotic operations with its trim press in an already integrated package using some novel methods. The Doyle Company stood to benefit both from establishing a relationship with a large customer likely to make future purchases if pleased with Doyle's product, and on the Long & Ellison end, the Doyle Company was building a relationship with one of the few suppliers of robots.

The plaintiff asserts that this whole idea from the outset was a sham, or, at least, it became a sham as the defendants discovered the substantial debts of the Doyle Company. Viewed in the light most beneficial to the plaintiff, there was sufficient evidence in the record to support a conclusion by the jury that the defendants decided to abandon the Doyle Company, and were motivated by the idea of starting a new company to carry on the Doyle automation concept. Specifically, Testwuide, seeking

comments from Kazmierczak and others, circulated a chart which suggested a few possible strategies for handling Doyle's financial situation, including the possibility of a totally new organization. This idea was discussed with Marschke, and Marschke testified that the defendants had considered the possibility of starting anew. In a letter from Marschke to Testwuide, Marschke wrote "do you want to spend a substantial portion of your time over the next two years bringing an investment back to a zero net worth and saving the financial skin of [Ed Doyle]?" There was also evidence that the defendants were aware of technical problems with the system which needed to be resolved before sales of the automation systems would be fully viable. Thus, the jury had a reasonable basis upon which it could conclude that the defendants took steps to keep the company viable only long enough to work out some of the technical problems with the system. As a final step, however, and perhaps with the anticipation of starting anew, the defendants voted to close the doors of Doyle and turn over all the assets, including Mercury Marine's robot, to the bank. Consequently, in effect a two step interference arose: first, intervening in the Long & Ellison–Mercury Marine contract, and second, the legal basis upon which the claim is founded, interfering with the execution of the Mercury Marine–Doyle Company contract by voting to close the doors of the Doyle Company.

■ The defendants assert that they lacked the requisite intent to interfere. The comments accompanying the Restatement (Second) of Torts addressing intentional interference with contract indicate that the rule of intentional interference applies "to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." Comment j of § 766, Restatement (Second) of Torts.

There is no dispute that at some discrete point in time the defendants decided to close the doors of the Doyle Company, and there is evidence that they intentionally secured the remaining assets of the Doyle Company in order to turn them over to the bank. While the nonperformance of Doyle's contract with Mercury Marine was incidental to the defendants' independent purpose of closing the company, the jury could readily conclude that the defendants knew the breach of contract with Mercury Marine would be a necessary consequence of their action.

The defendants argue, however, that it was not their choice to close Doyle Company which resulted in the nonperformance of the contract, but rather, that it was Doyle's faltering financial condition which made performance impossible since the Doyle Company was not making payroll. The record indicates, however, that the Doyle Company did make payroll subsequent to defendant Marquip's payment to the Doyle Company for the robot which had been shipped from Long & Ellison. There was also evidence that the Doyle Company continued operations, including sales calls and engineering work right up until the time the doors were closed. The court also notes that if performance were made impossible by the Doyle Company's inability to meet payroll expenses, this would constitute an action which was attributable to the defendants as directors of Doyle Company who determined the priorities for payments from Doyle's assets.

The defendants argue that any acts of "interference" with the contract in this case were privileged as a matter of law, since they were taken for the benefit of the owners of the Doyle Company. The plaintiff responds that an individual can only be privileged to interfere with a contract when the individual responsible for inducing the breach causes a benefit to be accrued to the contracting party on whose behalf the individual is acting. The plaintiff asserts that in this case, there was no benefit to the Doyle Company, only to the owners of the Doyle Company, and consequently there was no privilege.

■ Directors of a corporation who authorize a breach of contract between the corporation and a third person are only protected by a conditional privilege, which will be destroyed by a wrongful motive.

*Harman v. La Crosse Tribune*, 117 Wis.2d 448, 344 N.W.2d 536 (Ct.App.1984); *citing Lorenz v. Dreske*, 62 Wis.2d 273, 287, 214 N.W.2d 753 (1974). If they are acting in *good faith for the protection of the interests of their corporation* and in the course of their official duty, they will sustain no liability for the breach. *Id.; See also Allen & O'Hara*, 898 F.2d at 516; Restatement (Second) of Torts § 769, comment d (interference is wrongful if it is an abuse of the fiduciary relationship to the person influenced—i.e. the Doyle Company).

■ Plaintiff asserts that the defendants engineered the interference with the Doyle–Mercury contract to advance their own interests, not the interests of the Doyle Company, and this defeats any privilege. An actor having a financial interest in the business of the person induced to breach is privileged if he does not employ wrongful means, and acts to protect his interest from being prejudiced by the relation. Restatement (Second) of Torts § 769. Generally, courts give the officers of a corporation unfettered independence to make business decisions. *Kumpf v. Steinhaus*, 779 F.2d 1323, 1325 (7th Cir.1985). However, this grant of independence, formally labelled the "business judgment doctrine," is based upon a fundamental assumption that the owners and directors of a company act to serve the interests of the company. *See Id.* Many business decisions may have a short term, or even permanent detriment to the company, but the courts, nevertheless, presume that the decision was made in the good faith belief that it would ultimately serve to further the interests of the company and its investors.

Should the directors of a company make decisions which are antithetic to the interests of the company, they are no longer acting in good faith, and they are functioning outside of the scope of their official duties as directors. This is a breach of the director's fiduciary duty to the corporation, and constitutes wrongful means, not subject to privilege. Restatement (Second) of Torts § 769, comment d; *See also Warrensburg v. RCA Corporation*, 571 F.Supp. 743 (W.D.Mo.1983); *Harman v. La Crosse Tribune*, 117 Wis.2d at 448, 344 N.W.2d 536; *Cf. Kumpf v. Steinhaus*, 779 F.2d at 1325.

This rule would appear to be premised in the theory that the directors of a corporation owe a duty to *all* of the owners of a corporation. If the directors breach their fiduciary duty because it benefits an individual director's interests (i.e. Marschke's interest in Marquip, Testwuide and Kazmierczak's interest in Schreier), other owners (e.g. Ed Doyle) may be harmed.

The defendants assert, however, that at the time of the interference, they were the only owners of the Doyle Company, and so their interference did not breach a fiduciary duty to any owners, but rather was a benefit to the owners, and thus, loyal to their fiduciary duty. This position would seem to be supported by the discussion in *Kumpf v. Steinhaus*, 779 F.2d at 1325. *See also Warrensburg v. RCA Corporation*, 571 F.Supp. 743 (W.D.Mo.1983).

While the defendants' assertion may have merit, the court need not resolve this question since privilege also falls when wrongful means such as fraudulent misrepresentations are employed. *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d at 516. The jury had sufficient evidence upon which to find that the defendants engaged in fraudulent misrepresentations. Specifically, the evidence is sufficient to support a finding that the defendants fraudulently misrepresented to Mercury Marine and to Long & Ellison that if they agree to rewrite their contract through the Doyle Company, the Doyle Company would assure the same, or better, performance. In furtherance of this misrepresentation, the defendants intentionally misrepresented their financial condition to Mercury Marine and to Long & Ellison with no intention of performing on either contract.

The misrepresentations to Long & Ellison, including the deceptive use of a Schreier Malting purchase order, are relevant since Mercury and Long & Ellison had a preexisting relationship, and had Long & Ellison known of Doyle's financial condition, the rewriting of the Mercury Ma-

rine—Long & Ellison contract might not have taken place. Jim O'Connor, from Mercury, testified that he would not have placed a purchase order with the Doyle Company if Kerry Doyle had not represented that the Doyle Company was going to pass the down-payment directly along to Long & Ellison. Furthermore, had Long & Ellison and Mercury known of the tenuous standing of the Doyle Company, both companies might have sought the use of a U.C.C. form filed with the Secretary of State to secure their interests in the robot.

Thus, the jury could conclude that the defendants intentionally made misrepresentations, that if Long & Ellison knew of the Doyle Company's financial woes they would have used a U.C.C. form filed with the Secretary of State to secure their rights in the robot, and had the Doyle Company passed the 90% down-payment along to Long & Ellison as they had promised, Long & Ellison could have recaptured their robot, and either returned Mercury's down-payment or delivered the robot upon final payment of the outstanding 10%. Consequently, there was sufficient evidence for the jury to conclude that the defendants engaged in fraudulent misrepresentations as a wrongful means of interfering with the plaintiff's contract. Accordingly, the defense of privilege fails, as does the motion for judgment notwithstanding the verdict.

## II. Motions for a New Trial

### A. Intentional Interference– Motion for a New Trial

The defendants move for a new trial based upon asserted errors in the jury instructions and in the admission of testimony by Long and Lorenz. As noted above, this court finds no error in the admission of testimony by Long and Lorenz. The court will, however, consider the defendants' motion for a new trial taking into account the asserted errors in the jury instructions.

■ The test to be applied in determining whether a motion for a new trial should be granted is whether the verdict is against the weight of the evidence, that the dam-

ages were excessive, or that, for other reasons, the trial was not fair to the moving party. *Fleming v. County of Kane*, 898 F.2d 553 (7th Cir.1990). A jury verdict will not be set aside unless it is against the manifest weight of the evidence. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).

■ The defendants allege numerous errors in the jury instructions. A particular jury instruction is acceptable if the instruction given adequately presents the objecting party's theory. *McDonald v. Sandvik Process Systems, Inc.*, 870 F.2d 389, 395 (7th Cir.1989). This standard requires a determination whether, "in a common sense manner ... the correct message was conveyed to the jury reasonably well." *Wilk v. American Medical Ass'n*, 719 F.2d 207, 218 (7th Cir.1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). The refusal to give a particular instruction is not considered reversible error unless, in light of all the instructions, the evidence, and the arguments, it appears that the jury was misled or misapprehended the issues before them. *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591 (7th Cir. 1985).

■ In reviewing a challenge to a jury instruction, the court considers the instruction not in isolation, but in the context of the trial as a whole. · *Sims v. Mulcahy*, 902 F.2d 524, 533 (7th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990). That is, the court must consider the challenged instruction in the context of all the instructions given to the jury and in light of the complaint, arguments and evidence in the record. *Lynch v. Belden And Co.*, 882 F.2d 262, 267 (7th Cir.1989), *cert. denied* — U.S. —, 110 S.Ct. 1134, 107 L.Ed.2d 1040 (1990); quoting *General Leaseways Inc. v. Nat. Truck Leasing Ass'n*, 830 F.2d 716, 725 (7th Cir.1987).

■ Courts will not reverse a judgment due to error in jury instructions unless the error affects the substantial rights of the parties. *General Leaseways*, 830 F.2d at 725; Rule 61, Fed.R.Civ.P. Reversal is warranted due to an error in jury instruc-

tions only if the party challenging the instruction shows prejudice resulting from the instruction. *Vaughn v. Willis*, 853 F.2d 1372, 1376 (7th Cir.1988).

The defendants contend that the court's instruction on privilege was in error, both in terms of who carries the burden of raising privilege, and in the court's explanation of what privilege meant.

■ The court instructed the jury that "officers, directors, and owners of a corporation may be permitted (or 'privileged') to induce their corporation to violate a contractual obligation if this would be beneficial to a legitimate interest of the corporation."

The defendants argue that the use of the word "may" allows the jury to find that the defendants' acts were not privileged, even though they were "beneficial to a legitimate interest of the corporation." The defendants also assert that it was error not to instruct the jury what interests were legitimate, and that owners are ordinarily exempt from liability.

Comment b to § 767, Restatement (Second) of Torts states that there is no "crystallized set of definite rules as to the existence or nonexistence of a privilege to act [to intentionally interfere with the performance of a contract]. Because of this fact, this section is expressed in terms of whether interference was improper or not, rather than in terms of whether there was a specific privilege to act in the manner specified."

Consequently, it is not relevant whether owners are "ordinarily exempt from liability," since there is not the same absolute privilege as found in other business doctrines. Furthermore, the defendants' actions may not be privileged even when they are beneficial to a legitimate interest of the corporation, such as when the defendants' conduct involves the use of violence or fraudulent misrepresentation. *Allen & O'Hara, Inc.*, 898 F.2d at 516; Comment c, § 767, Restatement (Second) of Torts. For that reason, this court instructed the jury as to the factors to be considered in determining whether a defendant's conduct was justified, in accordance with § 767 of the

Restatement (Second) of Torts and § 2780, Wisconsin Jury Instructions (1990).

The defendants have not suggested what prejudice arises from the use of the term "legitimate", and in view of the court's instructions in determining whether interference is proper, this court stands by its instruction.

■ The defendants also assert that the jury should have been instructed that privilege applies not only when the owners further a legitimate interest of the corporation, but also when the directors, owners or officers act to protect the owners' interest. Again, the defendants are asserting that an interest which is antithetical to the well being of the corporation is privileged if it is beneficial to the owners of the corporation. The court notes that this proposition is of questionable validity, and the defendants' instruction would have left the jury to speculate whether privilege applies when the action benefits *some* of the owners, but not *all* of the owners of a corporation. Regardless, the court stands by its instruction. The court instructed the jury as to the factors to be considered in determining the existence of justification (or privilege). Amongst the justifications is whether the conduct was fair and reasonable under the circumstances. The defendants argued, and the jury could have found, that the defendants' actions, taken on behalf of *all* the owners of the corporation, were justified under the circumstances.

■ The defendants assert that the burden of proof of privilege was improperly placed upon the defendants. The Restatement (Second) of Torts § 767, comment b, indicates that in the tort of interference with contract, the burden of proof of privilege is generally, but not always, placed upon the defense. The defendants assert that the scant case law which discusses the proper allocation of the burden of proof of privilege relies upon § 766 of the original Restatement of Torts, and that the concept of privilege has been altered in the Second Restatement, such that the burden has shifted to the plaintiff. The defendants acknowledge that the issue, under

the Second Restatement of Torts has not been squarely addressed by the Wisconsin courts. The Restatement (Second) of Torts suggests however that justification or privilege is a defense, and thus a burden upon the defendant.

The comments accompanying the essential provisions of the Second Restatement of Torts indicate that a tort will lie where an actor's sole purpose was the intent to interfere. Although comment a of § 767 indicates that the interference must be both intentional and improper, comment j of § 766 states that the rule against intentional interference with contract is applicable if the actor acts for the primary purpose of interfering, and comment d of § 767 states that "intent alone ... may not be sufficient to make the interference improper" if the actor was not motivated by his desire to interfere. This suggests that in some instances the intent to interfere, standing alone, may be improper, and thus sufficient to establish liability if the intent to interfere is the sole motive.

Comment b of § 767 states that "[a]mbiguity as to the scope of the privileges available for the tort of intentional interference with an existing or prospective contractual relation has meant that some of the factors listed in this Section are sometimes treated as going to the culpability of the actors conduct in the beginning, rather than to the determination of *whether his conduct was justifiable as an affirmative defense.*" (emphasis added). These comments all support the position of the earlier cases relied upon by the plaintiff, that a showing of intent to interfere makes a *prima facia* case, and that justification or propriety in the motive acts as an affirmative defense. See *Chrysler Corp. v. Lakeshore Commercial Financial Corp.*, 389 F.Supp. 1216, 1221 (E.D.Wis.1975) *affirmed*, 549 F.2d 804 (7th Cir.1977).

The court observes that the incorporation of the secondary requirement of *improper* interference into the Second Restatement of Torts appears intended as a means of capturing the situation where the actor was not principally intending to interfere, and the interference, which was incidental, was nonetheless improper. Thus, the defense that an actor's actions were not intended, but incidental, requires the additional assertion that the actions were also justified. *See* Comment j, § 766, Restatement (Second) of Torts.

Accordingly, this court finds that the burden of proof was properly placed upon the defendants.

 The defendants also object to the court's instruction on intent. Specifically, the defendants argue that liability could be imposed under the court's instruction where the interference was a collateral consequence of the actor's actions. As discussed above, intent to interfere may be sufficient to find liability if it is the actor's sole purpose, or the requisite intent may be found if the actions were intended, knowing that interference was a collateral consequence of those actions, and the actions did not have a proper justification. Thus, the court's instruction was proper.

 The defendants' final argument with respect to the intentional interference with contract claim is that the court's instruction allowed liability to be found despite the fact that the defendants' actions did not cause the breach, but rather the breach was inevitable due to impossibility. The court instructed the jury that "[t]he defendant's conduct under consideration must have been a factor actually operating and which had a substantial effect in producing the damages claimed by the plaintiff." The defendants argued that the contract could not have been performed regardless of the defendants' actions. Had the jury believed this assertion, they could have found that the defendants' conduct was not factor which actually resulted in the plaintiff's damage. There was abundant evidence, however, that the causal connection existed, and the jury could reasonably reject the defendants' assertion that the contract could not have been performed.

 The defendants also object to the court's decision not to give other instructions which were requested concerning the standards of commercial law. Initially, the

court notes that the tort of intentional interference with contract is itself a standard of commercial law, establishing parameters of allowable behavior in relation to third party involvement in contractual undertakings. *See Blacks Law Dictionary,* 270 (6th ed. 1990). It was not necessary or proper to instruct the jury on other standards of commercial law. The heart of the tort of intentional interference with contract is whether the interference was intended, and improper. The appropriate standards for privileged or proper conduct in other aspects of commercial law may have affected the defendants' motives and purposes in acting as they did, but "this branch of tort law has not developed a crystallized set of definite rules as to the existence or nonexistence of a privilege to act in [interference with a contract]." Comment b, § 767, Restatement (Second) of Torts.

While instructions concerning commercial law may have influenced the jury concerning the factors to be considered in deciding if an interference was justified, the jury was told that if the defendants were acting within what they believed to be proper standards of behavior under commercial law, the jury could conclude that the defendants' motives were not improper. The language requested by the defendants places an undue emphasis on the standards of other commercial law doctrines.

■ Finally, in light of the defendants' numerous and varied assertions of error, it is appropriate to comment on their request for a new trial considering whether the jury's verdict was against the manifest weight of the evidence.

The defendants obtained an interest in the Doyle Company expecting to find a company with a good idea in need of some direction. Apparently, the defendants had successful experiences in their own companies, and felt that with some leadership and financial support they could succeed with the Doyle Company. What they found was a grim picture which had previously been glossed over and hidden. Neither party disputes this.

At the heart of this case is not whether the defendants' actions caused plaintiff's damages—substantial evidence supports the premise that it did—nor is this a question of whether the defendants intended their actions; the evidence demonstrated that the act of closing the Doyle Company was given much thought and consideration. Rather, the heart of this dispute is whether the defendants acted improperly.

The defendants have claimed that they acted up to the limits of the law, but did not act beyond those limits. The jury was not posed with the question of "whether the [defendants] were justified in causing the harm, but rather whether [they are] justified in causing it in the manner in which [they did] cause it. The propriety of the means is not determined as a separate issue unrelated to the other factors. On the contrary, the propriety is determined in the *light of all factors present.*" (emphasis added) Comment c, § 767 Restatement (Second) of Torts.

Even if each individual act of the defendants by itself is permissible under some commercial law doctrine, the evidence, taken as a whole, is sufficient to support the jury's verdict. The defendants first led Mercury Marine and Long & Ellison to rewrite their contract so the purchase would go through the Doyle Company, then an agent of the Doyle Company induced Mercury Marine to pay 90% of the purchase price on the promise that it would be passed directly to Long & Ellison. While the defendants may not have specifically requested this increased downpayment, the evidence supports that they knew about it at the time of closing the Doyle Company. The defendants also represented themselves to be financially sound and under committed leadership. Then, they closed their doors, keeping Mercury Marine's equipment and money. While each individual act in isolation may not have been improper, there is ample evidence for a jury to conclude that in light of all these other factors, the defendants' final act of turning the keys over to the bank was an improper interference with the Doyle–Mercury Marine contract. The defendants' mo-

tion for a new trial on the intentional interference with contract claim is denied.

### B. RICO and WOCCA—Motions for a New Trial

Rule 50(c), Fed.R.Civ.P., provides that if, as here, a motion for judgment notwithstanding the verdict is granted, the court shall also rule on a motion for a new trial, if filed, in case judgment notwithstanding the verdict is subsequently reversed or vacated. Pursuant to Rule 50(c) and Rule 59, Fed.R.Civ.P., should this court's judgment notwithstanding the verdict be reversed or vacated, the court denies the defendants' motion for a new trial.

The defendants assert that a new trial is warranted on the racketeering claims because the jury was improperly instructed on the requirements of continuity and conspiracy, and because the court failed to instruct the jury what precise predicate acts were alleged, allowing the a verdict which was not unanimous with respect to particular predicate acts by particular defendants.

▇▇ Turning first to the court's continuity instruction, the defendants make two astute observations: 1) the quarrel about the jury instructions reflects a deeper dispute about the scope and meaning of applicable substantive law, as discussed above,[5] and 2) continuity is an issue with which courts have grappled for a decade.[6] The defendants argue that the jury needed to know more, and should have been given the defendants' proposed instruction.

The court instructed the jury that continuity could refer to a closed period of repeated conduct or to past conduct that, by its nature, projects into the future with a threat of repetition. The court further instructed the jury as to the factors identified in *Morgan v. Bank of Waukegan,* 804 F.2d at 975. This set forth a sufficient basis upon which the defendants could and did argue their theory of defense, that their activities amounted to no more than a one time, short lived effort to minimize losses, and consequently did not threaten

repetition. The defendants attempted to persuade the jury that the alleged scheme didn't make sense, and did not pose a threat of continued criminal activity. The court rejects the defendants' contention that the jury needed more explicit standards since, to the extent that the threat of continuity in this case is a question for the jury at all, the jury needed to draw upon its common sense in assessing that threat, and the court's instruction furnished them with the guidelines upon which to draw in making that assessment.

▇▇ The defendants assert that the jury should have been told the specific predicate acts which were alleged, and the jury should have been instructed that its verdict had to be unanimous with respect to particular predicate acts by particular defendants. As plaintiff correctly points out, it was decided during the instruction conference that the court would not enumerate all of the alleged predicate acts, ie. each mailing or wire communication taken in furtherance of the fraudulent schemes. The value of such enumeration was questionable since there were in excess of one hundred exhibits, many of which constituted mailings in furtherance of the alleged scheme. Furthermore, the plaintiff made specific references to predicate acts in closing arguments, so the jury heard what some, but not all, of these alleged acts were. Accordingly, the court stands by its decision not to enumerate the specific predicate acts which might be attributable to each individual defendant.

Regardless, the court notes that the defendants never asserted as a theory of defense that any particular individual had not participated in the requisite two predicates. Rather, the defense theory was that the defendants' conduct did not amount to fraud, and in any event, not racketeering. In light of the numerous letters exchanged between the defendants, once the jury accepted that any particular defendant participated in the general scheme to defraud the plaintiff, the defendants would have had a

---

**5.** Defendants' reply brief dated November 2, 1990 at 10, n. 5.

**6.** Defendants' brief in support of motions, dated October 9, 1990, at 14.

difficult time proving that any of the individual defendants did not use the United States mail or interstate wire communication on two occasions in furtherance of the scheme. Even if an individual defendant could have proven he never used the mail or wire communications, a conspirator is responsible for offenses committed by his fellow conspirators, *United States v. Troop,* 890 F.2d 1393, 1399 (7th Cir.1989); *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946), and the jury unanimously found that each defendant was a member of the conspiracy.

■ The jury was instructed that its verdict on each question had to be unanimous, and the special verdict submitted to the jury listed each defendant individually. Consequently, the jury effectively was told that it had to reach a unanimous decision, as to each defendant, whether the defendant "participate[d] in the conduct of the E.A. Doyle Manufacturing Company through a pattern of racketeering." The defendants appear to be asserting that the jury could find that the Doyle Company committed the requisite two predicates, without ever addressing whether the individual defendants committed two predicates. The jury, however, was instructed that a "pattern" required proof "that the individual defendant committed at least two predicate acts of racketeering within a ten year period." Thus, the instructions, read together with the special verdict, required the jury to reach a unanimous decision for each defendant regarding the commission of two predicate acts. Again, however, even if a flaw did exist in the instruction, the defendants have not shown that this flaw affected the outcome or prevented them from pursuing a theory of defense, and consequently, the defendants have failed to show that they were prejudiced.

■ The defendants allege the jury was misled in the standard for finding membership in the racketeering conspiracy because the court made general reference to an association formed to accomplish "some unlawful purpose", or "some lawful purpose by unlawful means," without specifying the particular unlawful purpose, ie. racketeering. However, the defendants are alleging fault in the court's conspiracy instruction by attacking the instruction regarding the admissability of evidence as to an act or statement of a conspirator against all coconspirators.[7] The court acknowledges that the instruction concerning the admissability of coconspirator evidence is framed in general terms of "some" unlawful purpose or unlawful means. The actual conspiracy instruction, however, is very specific, and makes clear that to be found guilty of conspiracy, the defendant must have knowingly come "to a mutual understanding to try to accomplish a common and unlawful plan, namely, *to engage in a 'pattern of racketeering activity,'*" with "the specific *intent to personally participate in the pattern of racketeering activity* ... or that he specifically intended to otherwise participate in the affairs of the 'enterprise' with the knowledge and intent that other members of the conspiracy would commit two or more acts of mail or wire fraud as *part of a 'pattern of racketeering'*" (emphasis added).

The court's subsequent instruction on the admissability of coconspirator evidence is ancillary to the conspiracy instruction; read together, the instruction on coconspirator evidence does not contradict the conspiracy instruction, but rather, supplements it. Accordingly, the court finds no error.

■ Finally, the defendants assert that the court should have given an instruction that "puffing" or expressions of opinion are not enough to support a scheme to defraud. The distinction between "puffing," or, in the defendants' words, "the hard sell," and fraud was sufficiently contained in the court's instructions. Specifically, the jury was told that fraud involved knowledge of the scheme and the intent to defraud. The jury was also told that intent to defraud involved specifically intending to deceive by making a false statement, knowing the falsity or being recklessly in-

---

**7.** Entitled "Common Scheme or Plan—Evidence of Acts or Declaration of a Confederate".

different to the falsehood, and involving a material fact. The jury was also told that the failure to disclose to a customer that a corporation is in poor financial health is not fraud in the absence of affirmative misrepresentations, half truths or attempts at concealment calculated to deceive the customer.

These instructions were adequate to present the defendants' theory of the case. The jury could have found either that the defendants' acts were not fraud because the defendants' statements were only opinions, not representations of fact, or the jury could have found that, even if the defendants' "hard sell" crossed the line into the realm of fraud in this instance, that continuity was lacking.

### III. Motion to Modify Damage Award

Finally, the court notes that the defendants moved to strike both the treble damage award and the award of interest on the intentional interference with contract claim. The defendants concede, however, that if judgment against the defendants were entered on the intentional interference with contract claim alone, thus eliminating the treble damage award, that plaintiff would be entitled to interest. In light of the defendants' concession, and the court's ruling, granting judgment notwithstanding the verdict in favor of the defendants on all but the interference with contract claim, the defendants' motion to strike the treble damage award and the award of interest is moot, and consequently denied. The court will, however, enter a conditional ruling, in the event that the court's ruling granting judgment notwithstanding the verdict is vacated or reversed.

The defendants note that RICO does not provide for prejudgment interest on top of multiple damages since multiple damages are sufficient to compensate the plaintiff for any loss arising from the unavailability of their funds. Consequently, the defendants assert that the award of prejudgment interest on the interference with contract claim is unnecessary and inappropriate since a multiple damage award would be sufficient compensation for losses arising from the unavailability of the plaintiff's funds. While the defendants' argument is facially compelling, the court, nevertheless, stands by its prior ruling that the plaintiff is entitled to recover prejudgment interest on the amount of the award under the intentional interference with contract claim.

The availability of prejudgment interest on an award for intentional interference with contract is a means of compensating an injured party for the loss of the use of its funds. In contrast, the multiple damage provision of RICO is a punitive measure. There is merit in the assertion that the multiple damage provision in this case would more than compensate the plaintiff for the loss suffered from the unavailability of funds. However, the RICO claim and the intentional interference with contract claim are distinct claims. Congress made the decision of what level of punitive damages is appropriate under RICO as a deterrent. While it may be appropriate to consider the adequacy of multiple damages as compensatory for the unavailability of funds within a RICO claim, considering the adequacy of multiple damages arising from a RICO claim in place of prejudgment interest in a corresponding tort claim is too attenuated. The court does not intend to diminish Congress' statement regarding the appropriate amount of punitive damages by deducting prejudgment interest on plaintiff's tort claim. Thus, if the court's grant of judgment notwithstanding the verdict on the RICO and WOCCA causes of action is vacated or reversed, the court denies the defendants' motion for the elimination of prejudgment interest.

As to the defendants' request to eliminate the treble damage award, it is the opinion of the court that the defendants' activities, under any characterization, as a matter of law, do not amount to racketeering. Consequently, the defendants' motion for judgment notwithstanding the verdict was granted. If the jury's verdict is reinstated, then the jury has spoken, Congress has spoken, and treble damages are appropriate.

IT IS THEREFORE ORDERED that:

1) Defendants Schreier Malting, Marquip Corporation, Testwuide, Kazmierczak, and

Marschke's motion for judgment notwithstanding the verdict on the federal RICO cause of action is granted.

2) Defendants Schreier Malting, Marquip Corporation, Testwuide, Kazmierczak, and Marschke's motion for judgment notwithstanding the verdict on the state WOCCA cause of action is granted.

3) The defendants' motion for judgment notwithstanding the verdict on the intentional interference with contract cause of action is denied.

4) The defendants' motion for a new trial on the intentional interference with contract cause of action is denied.

5) The defendants' motion to strike the treble damage award and the award of interest is moot, and consequently denied.

6) The defendants' motion for a new trial on the two racketeering claims, RICO and WOCCA, is conditionally denied, in the event that this court's judgment notwithstanding the verdict on these two claims is vacated or reversed.

7) The defendants' motion for modification of the judgment, to eliminate the treble damage award or to eliminate the award of prejudgment interest on the interference with contract claim, is conditionally denied, in the event that this court's judgment notwithstanding the verdict on the two racketeering claims is vacated or reversed.

8) The previous judgment entered September 28, 1990 is hereby amended, and judgment dismissing the federal RICO and state WOCCA causes of action against the defendants shall be entered in favor of all defendants, except the E.A. Doyle Manufacturing Company. Judgment on the intentional interference with contract claim shall be entered in accordance with this court's September 28, 1990 Order for Judgment awarding the plaintiff $63,107.00 in damages and $12,830.40 in interest, for a total award of $75,937.40. Plaintiff is entitled to taxable costs.

SO ORDERED.